## PITTSBURGH'S PET'N, FOR BOARD OF VIEWERS.

### G. I. WHITNEY v. CITY OF PITTSBURGH.
### T. B. ATTERBURY v. CITY OF PITTSBURGH.
### J. A. GILLESPIE v. CITY OF PITTSBURGH.

APPEALS BY THE CITY OF PITTSBURGH FROM THE COURT OF
QUARTER SESSIONS AND THE COURT OF COMMON PLEAS
NO. 1 OF ALLEGHENY COUNTY; AND BY G. I. WHITNEY, T.
B. ATTERBURY AND J. A. GILLESPIE, FROM THE COURT OF
COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY.

| | |
|---|---|
| 138 | 401 |
| 147 | 17 |
| 147 | 350 |
| 138 | 401 |
| 159 | 36 |
| 138 | 401 |
| 179 | 636 |
| 138 | 401 |
| f199 | 547 |
| 138 | 401 |
| 212 | 353 |

Argued February 13, 1891—Decided March 16, 1891.*
                    [To be reported.]

1. The sections of the acts of June 14, 1887, P. L. 386, and May 16, 1889,
P. L. 228, relating to streets and sewers in cities of the second class,
which provide for the creation and fix the powers and duties of a board
of viewers to assess damages and benefits arising from the opening
and improvement of streets and the construction of sewers in such
cities, are unconstitutional and void: Wyoming St., Pittsburgh, 137
Pa. 494.

2. The board of viewers is an indispensable part of the system of assess-
ments which said acts undertake to establish, and with the striking
down of the board of viewers that system must fall as a whole; where-
fore, all assessments of damages and benefits made under said acts are
invalid, all work done or to be done thereunder must be paid for by
the city, and all damages inflicted upon property owners thereby must
be recovered from the city.

3. Even if the system of assessments provided for the city of Pittsburgh,
by the act of January 6, 1864, P. L. 1131, and its supplements, be still
in existence for any purpose, that system cannot be resorted to in a case
where street improvements have been conducted in accordance with the
provisions of the act of June 14, 1887, P. L. 386, and without a com-
pliance with the conditions prescribed by the prior acts.

4. The fact that the act of June 14, 1887, P. L. 395, "in relation to the
government of cities of the second class," fixed certain dates for the
doing of things necessary to put the city government in operation, com-
pliance with which direction was possible only in the city of Pittsburgh,
the then sole city of that class, and made no corresponding provision
for cities afterwards coming into it, does not render the act invalid as a
local law.†

---

* This case was heard by advancement in the Eastern District, and the
report of it is advanced by direction of the Court.
† See Commonwealth v. Wyman, 137 Pa. 508.

### Statement of Facts.

5. The declaration in §§ 1 and 9 of the act of June 14, 1887, P. L. 395, that the powers of the councils and of certain officers of cities of the second class shall remain "as heretofore," does not offend against § 6, article III., of the constitution, prohibiting the reviving, amending, extending or conferring of laws without a re-enactment at length, as it does not extend or confer powers, previously exercised in some other way, to the incumbents of newly created offices.

6. But §§ 5, 6 and 7, in so far as they confer statutory powers, previously exercised by officers whose offices are discontinued, upon heads of departments created by the act, are unconstitutional and invalid, and such heads of departments possess no powers except such as are conferred by §§ 15, 16 and 17; and § 18, authorizing the councils to create new departments in the city government and to define their powers, is also unconstitutional.

7. Suggestions as to other objectionable features in the street acts of June 14, 1887, P. L. 386, and May 16, 1889, P. L. 228, for cities of the second class, as to the appropriation of private property; the assessments for damages and benefits occasioned; the costs of the collection of benefit assessments, and the relations of cities to contractors and citizens, given at the request of counsel: Per Mr. Justice WILLIAMS.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 67, 68, 69, 70, 83, 84, 85 October Term 1891, Sup. Ct.; courts below, No. 41 December Term 1890, Q. S.; Nos. 596, 594, 595 March Term 1891, C. P. No. 1, in Equity.

### PITTSBURGH'S PETITION.

On January 22, 1891, the city of Pittsburgh, by William C. Moreland, city attorney, petitioned the Court of Quarter Sessions of Allegheny county for the appointment of a board of viewers of street improvements. The petition averred:

That Pittsburgh is a city of the second class; that pursuant to the provisions of the street acts of June 14, 1887, P. L. 386, and May 16, 1889, P. L. 228, it constructed various sewers and boardwalks, and has opened, graded and paved several streets, and that it has now on hand some uncompleted work on sewers and streets; that said acts provide for the payment of the damages, cost and expenses of said improvements, by an assessment by the board of viewers provided for in said acts, upon the properties benefited thereby; that the Supreme Court of the state of Pennsylvania, in Wyoming St., 137 Pa. 494, recently decided that said act of 1887, so far as it " relates to the

Statement of Facts.

creation, functions, powers and compensation of the board of viewers," is in violation of § 7, article III., of the constitution; that said act of 1889 has substantially the same provisions respecting the "creation, functions, powers and compensation" of the viewers; that the said city, therefore, has no power or authority, contained in said acts, to collect assessments already made, or to cause new assessments to be made; that there already exists a liability on account of said improvements, which amounts to $1,228,886; that under both said acts there was and is power to make such improvements, and to cause to be assessed the damages, costs and expenses thereof upon the properties benefited; that, said acts being unconstitutional only in respect to the "creation, functions, powers and compensation" of the board of viewers, and repealing only such legislation as is inconsistent therewith or supplied thereby, said city is remitted to the acts of May 13, 1871, P. L. 840, and March 20, 1873, P. L. 325, which provide for the appointment of viewers by the Quarter Sessions court.

The petitioners, therefore, prayed the court to appoint three viewers whose "functions, powers, duties and compensation" should be such as are provided by the act of January 6, 1864, P. L. 1131, and its various supplements, among which are the said acts of 1871 and 1873, and this for the purpose of having the damages, costs and expenses of said completed improvements, as well as uncompleted and future improvements, equitably assessed upon the properties benefited thereby.

To this petition, T. B. Atterbury, G. I. Whitney, and J. A. Gillespie excepted, on the ground that there was no power in the court to appoint the viewers for the purposes prayed for.

The act of January 6, 1864, P. L. 1131, provided, inter alia, that whenever the councils of the city of Pittsburgh should desire to lay out, open, widen, straighten or extend any street, lane or alley, they should appoint three disinterested freeholders as viewers, to appraise the damages arising therefrom to private property, and to assess such damages upon the properties benefited by such improvement; which viewers should report to the councils, and their report should be subject to an appeal to councils by any persons aggrieved, and to a further appeal from the final action of councils to the Court of Quarter Sessions of the county. The act provided, also, that the dam-

ages and benefits arising from the grading or re-grading of streets, etc., should be assessed by three appraisers, appointed by councils, whose report thereof to the councils should be subject to appeal in the same manner as the reports of viewers appointed in connection with the laying out, etc., of streets.

The act of May 13, 1871, P. L. 840, supplementary to said act of 1864, contains the following provisions :

" Sec. 1. That it shall be the duty of the Court of Quarter Sessions, within thirty days after the passage of this act, to appoint three discreet freeholders of the city of Pittsburgh as viewers of street improvements, in said city, to serve for such term as said court may designate; and said court shall have power to remove said commissioners, or any of them, at any time, and to fill all vacancies which may occur by death, resignation, removal or otherwise."

" Sec. 3. Said viewers shall, before entering upon the duties of their appointment, be duly sworn to faithfully, honestly and impartially discharge the duties thereof so long as they may severally act as such; and, when so qualified, shall perform all the duties imposed upon and required by viewers, appraisers and assessors by the act to which this is a supplement and the various supplements thereto, and exercise all the powers conferred upon them in the same manner.

" Sec. 4. Said viewers shall receive as compensation for their services, the sum of five dollars for each day employed in the discharge of the duties of their appointment, to be paid from the city treasury out of such fund as councils may direct, upon the certificate of the city engineer, approved by the street or road committee, as the case may be, and the pay of viewers in each case, with other incidental expenses, shall be estimated by the viewers, added to the damages awarded or cost of construction, and assessed as part thereof."

By § 8, act of March 20, 1873, P. L. 325, it is provided

" That the board of viewers of street improvements, in the city of Pittsburgh, shall be appointed during the month of January of each year, and shall hold office for one year, dating from the first day of February following, unless sooner removed in accordance with the act of assembly entitled, 'An Act concerning the streets and sewers in the city of Pittsburgh,' approved May 13, 1871, and in case of removal, the appointment shall be made for the unexpired term of the person so removed."

The sections of the act of June 14, 1887, P. L. 386, relating to the appointment and functions of the board of viewers therein provided for, are given in the report of Wyoming St., Pittsburgh, 137 Pa. 494. The provisions of the act of May 16, 1889, P. L. 228, upon the same subject, are substantially to the same effect as those of the said act of 1887.

—On January 31, 1891, the court entered a decree refusing the prayer of the petitioner, whereupon the city took the appeal to No. 67, specifying that the court erred :

1. In refusing the petition for the appointment of viewers.

### WHITNEY, AND OTHERS, v. PITTSBURGH.

To No. 596 March Term 1891, of the Court of Common Pleas No. 1 of Allegheny county, J. A. Gillespie filed a bill in equity against the city of Pittsburgh, Booth & Flinn, contractors, and E. M. Bigelow, chief of the Department of Public Works of said city, praying for an injunction restraining the defendants from opening Lexington street, and restraining said city from making any assessment upon the plaintiff's property for the cost and expense of said improvement, and from proceeding to collect any such assessment; for a decree declaring the act of June 14, 1887, P. L. 395, the act of June 14, 1887, P. L. 386, and the act of May 16, 1889, P. L. 228, under which the city had undertaken to pass an ordinance for the opening of said street and to make such assessment, to be null and void, as in violation of the constitution, and that said city had no power or authority to lay out, open or otherwise improve any of the streets and highways within its limits. In addition to charging that the acts referred to were unconstitutional and void, the bill averred that the plaintiff's property was rural and not subject to assessment by the foot-front rule; that it was in a district wherein, under the act of April 1, 1868, P. L. 565, such an improvement could not be made without a written application of the majority in interest of the owners of property along the line of the street, and such application had not been made; nor, had the provisions of the act of May 1, 1876, P. L. 94, requiring a previous estimate of the cost of the improvement, and a schedule of the value of the properties affected, been complied with before the passage of said ordinance.

The defendants answered, denying that the assessments upon

Statement of Facts.

said street were according to the foot-front rule ; averring that they were according to benefits ; averring that the act of April 1, 1868, was supplied by that of June 14, 1887, P. L. 386 ; that the act of May 1, 1876, P. L. 94, was repealed by the act of May 27, 1889, P. L. 387 ; that the act of January 6, 1864, P. L. 1131, and its supplements, and the acts of June 14, 1887, P. L. 386, June 14, 1887, P. L. 395, and May 16, 1889, P. L. 228, were in force and governed and controlled said city ; that all the requirements of the act of June 14, 1887, P. L. 386, had been complied with in the matter of Lexington street, and that as a matter of fact the benefits were more than sufficient to pay the damages, costs and expenses.

To No. 594, of the same term in the court below, George I. Whitney filed a similar bill in equity against the same defendants, praying upon like averments for like relief in the matter of the grading, paving and curbing of Centre Avenue in the city of Pittsburgh, a contract for which had been let by said city to Booth & Flinn, pursuant to the act of June 14, 1887, P. L. 386, and an ordinance passed thereunder. The defendants filed an answer similar to that filed in the suit of J. A. Gillespie.

To No. 595, of the same term of the court below, T. B. Atterbury filed a bill in equity against the city of Pittsburgh, Evan Jones, contractor, and E. M. Bigelow, chief of the Department of Public Works, praying for an injunction restraining the construction by the defendants of a sewer on Thirty-third street, and the assessment and collection by said city of any benefit assessments from certain property owned by the plaintiff on account of the construction of said sewer, the grounds upon which the plaintiff prayed for relief being substantially the same as those set forth in the bills filed by Gillespie and Whitney ; averring further, however, that the route of the sewer was for a great distance on private property, through which the city had no power to locate or construct a sewer. This bill was answered by the defendants substantially in the same manner as the Gillespie and Whitney bills.

The three cases in equity were heard together, upon bills and answers, when an opinion, in part as follows, was filed by SLAGLE, J.:

Opinion of Court below

In each of the above cases, bills were filed by a citizen and property owner of the city of Pittsburgh, alleging that the city of Pittsburgh and its officers were opening and improving certain streets of said city, and proposed to collect the cost thereof by assessing the same upon the property of adjacent owners, including that of the plaintiffs, filing liens against their property abutting upon the streets respectively; and asking that they be restrained from so doing. The grounds upon which the power of the court is invoked are substantially the same in each case, and they may therefore be considered together.

It is claimed, first, that the councils of the city of Pittsburgh are organized in a manner not authorized by law, and are therefore without power to adopt the ordinances directing said improvements to be made, and that the officer who signed the contracts and superintended the work, being appointed by this illegal body, and his powers conferred by an unconstitutional act of assembly, they are without authority of law; and, second, that the acts of assembly under which the improvements are being made are unconstitutional and void, and therefore, the proposed assessments and liens are without authority of law. . . .

The objections stated are manifold. Some of them relate to all the acts, and may be considered in reference to all. One is specially applicable to the act of June 14, 1887, P. L. 395, that it revives, amends and extends or confers the provisions of other laws or parts thereof by reference thereto, and without re-enacting and publishing the same at length, and is therefore in violation of § 6, article III. of the constitution.

This section of the constitution has been considered in but few cases. In Barrett's App., 116 Pa. 486, the act considered, that of April 16, 1875, P. L. 55, authorized boroughs to vote for or against a gas and water tax. It was amended by the act of May 1, 1876, P. L. 93, which authorized a vote for either one or the other. Though called a supplement, it was clearly an amendment, and was so construed by the Supreme Court and held to be in violation of the constitution. In Titusville I. Works v. Oil Co., 122 Pa. 627, this section of the constitution was held to forbid the extension of the mechanics' lien law to persons and subjects not intended in the acts of 1836 and 1845, without re-enacting those laws.

These are the only cases in which the Supreme Court has

Opinion of Court below.

been called to give effect to this provision. Judge Hare, in the case of Donohugh v. Roberts, 11 W. N. 186, held that it prevented the transfer of the duties of the collector of delinquent taxes, in Philadelphia, to the receiver of taxes. Both were offices created by acts of assembly and having duties prescribed by the respective acts. None of these cases reach the point raised as to the councils of the city of Pittsburgh under the act of 1887. It must be remembered that the city of Pittsburgh had corporate existence before the passage of the act of May 23, 1874, P. L. 230, by which it was created a city of the second class. By that act, all the corporate powers then existing were continued in full force, except when otherwise provided by that act. It was perhaps not necessary to so provide, as the mere change of name would not have the effect of abrogating all laws relating to the corporation. Existing laws will not be held to be repealed, unless expressly so declared, or fully supplied: Erie Academy v. Erie City, 31 Pa. 515. It has been held in many cases that the constitution does not abrogate existing laws inconsistent with its provisions: Lehigh Iron Co. v. Lower Mac. Tp., 81 Pa. 482; Indiana Co. v. Agr. Soc., 85 Pa. 357.

By the act of May 23, 1874, it was provided that the legislative power of every city shall be vested in the councils thereof, which shall consist of two branches, the select and common council. The term of office of the members of select council shall be two years, and of common council one year, except in cities of the first class. The time and mode of election was not fixed, nor the powers specified. This was left to the acts previously existing which had been preserved by the first section. The organization of councils of the city of Pittsburgh, under this act, was the same as under the act of 1868, which was in force when the act of 1874 was adopted. It so continued until the passage of the act of June 14, 1887, P. L. 395. That act. provides that the legislative powers of cities of the second class shall be vested " as heretofore " in two branches, etc., reducing the number of members of select councils to one for each ward, to serve for four years instead of two. It makes no change in the representation of common councils, but provides that they shall serve for two years instead of one.

There is no attempt to confer new powers on the councils.

Opinion of Court below.

It does not create a new corporation or new officers, but changes the number constituting this body, already existing, and the time during which they serve. The first section of the act does not appear to be in violation of the sixth section of article III. of the constitution. If it is, then the act of May 23, 1874, is obnoxious to the same objection and we have no city government in the commonwealth.

But it is contended that the act is on its face local, affecting the affairs of cities, creating offices, for conducting the election of officers, etc. The argument for this contention is that it fixes dates when the number of select councils shall be reduced, dates for their election, time for carrying the provisions of the act into effect, and requiring officers therein provided to give bond, which provisions could not apply to any but the cities then in existence. The legislature having power to classify cities, legislation appropriate to those then existing would be justified. It would be a narrow construction of constitutional power, to condemn legislation because it might require further legislation to meet future wants.

The act 1874 provided for new cities coming into the third class, but it is silent as to those coming into the first and second classes. Mere acquisition of population would not have this effect. It is necessary that the fact of population should be ascertained in some mode provided by law. This rule was applied to other similar cases, as in the case of separate Orphans' Courts, and the application of the provisions as to salaries and fees of county officers. It was finally provided as to cities, by the act of May 8, 1889, P. L. 133.

If then, the legislation was proper for cities of the second class, it is general and not special or local. If, however, the act of 1887 is inconsistent with the provisions of the constitution referred to, it does not follow that the acts of the councils organized under its provisions are void. The city of Pittsburgh is a municipal corporation having undoubted legal existence. The councils constitute its government. In them all of its legislative and much of its executive power is placed. A body of men have been organized as constituting this body, and have exercised its functions under the provisions of an act of assembly. They constitute, therefore, de facto councils, and, if they had no pretence of legal existence, must be regarded

as such until their rights have been judicially determined. Their right to exercise the office cannot be questioned by a private individual directly in the mode prescribed by law. That can be done only at the instance of the commonwealth by appropriate writ: Campbell v. Commonwealth, 96 Pa. 344; Shartzer v. School D., 90 Pa. 192; Commonwealth v. Cluley, 56 Pa. 270; much less, in a collateral proceeding.

But it is said there can be no de facto officer, unless there be a de jure office. In this case, it will scarcely be contended that the office of councilman of the city of Pittsburgh has ceased to exist, because the legislature has undertaken to fix the number and term of the members in a manner not authorized by the constitution. If the act is unconstitutional, it is void; it is as if it had never been passed. All that can then be said is that the members should have been elected in the mode prescribed by acts of assembly previously existing. The office still exists, and there is a way to fill it provided by law. The case to which we have been referred by counsel for plaintiffs, Norton v. Shelby Co., 118 U. S. 425, and the authorities cited, show clearly that in such a case as this the actions of councils would be valid until they were ousted by due process of law.

If we are right in holding that the councils of the city of Pittsburgh are properly organized under the act of 1887, it would follow that their action in authorizing the improvements in question was valid and binding, if in other respects according to law. But it is said that this part of the act is inoperative, because other parts of the act are unconstitutional.

The portions of the act to which special attention is called are the fifth, sixth, seventh and ninth sections. We can see no objections to § 9. It merely does what the law itself would have done without this declaration, permits the office therein named to remain unaffected by this act. It is supererogatory, but does not for that reason invalidate the remainder of the act. The fifth, sixth and seventh sections would seem to be in violation of § 6, article III. of the constitution, in so far as they undertake to transfer powers or impose duties contained in existing laws. How far these sections are rendered nugatory, it is perhaps unnecessary to inquire. Where offices theretofore existing are retained, these powers would continue,

Opinion of Court below.

notwithstanding they are placed under the general jurisdiction and supervision of the chief of a department. As to legislative powers and duties, this would be beyond the control of councils or the chief. But, an ordinance is not a law, and in passing ordinances, if the councils observe the laws specially relating thereto, and in making regulations limit themselves to the powers conferred or implied, they are not bound by constitutional provisions relating to the passage of acts of assembly: Baldwin v. Philadelphia, 99 Pa. 164.

So far as the ordinances and resolutions of councils are concerned, there can be no legal objection to assigning the offices provided thereby to their appropriate department, and where new officers are appointed transferring the duties of other offices to them. It therefore appears clear that the whole of the act of 1887 may stand, except so far as it undertakes to transfer powers conferred by acts of assembly.

If, however, the whole of §§ 5, 6 and 7 were stricken out, the remainder of the act is consistent and may have effective force, and therefore comes within the rule that where a part of an act is void the remainder may be enforced unless they are so essential to each other that it cannot be presumed that one would have been adopted without the other: Allegheny Co.'s Home Case, 77 Pa. 77; Lea v. Bumm, 83 Pa. 237; Wynkoop v. Cooch, 89 Pa. 450; Dewhurst v. Allegheny City, 95 Pa. 437. We are therefore of the opinion that the councils of the city were properly organized under the act of June 14, 1887, P. L. 395, and that they might properly authorize the improvements in question, unless restrained otherwise than by the constitution.

If the contract was signed by the chief of Public Works, when it should have been signed by another officer, it seems to be immaterial, if the city had power to make the contract and directed it to be so signed, or recognized it after it was signed, in the absence of legislative direction as to who shall sign. But it is alleged that the act of June 14, 1887, P. L. 386, and the act of May 16, 1889, P. L. 228, under which the improvements mentioned are being made, are wholly unconstitutional and void, in that they are local laws. . . . . .

It cannot be contended that each clause of § 7, article III., of the constitution, creates a class as to which legislation must

apply to all, and no legislation as to particular subjects will be allowable.   For instance, the clause relating to ferries and bridges does not require that all legislation as to one must include the other.   They are entirely different, and laws relating to one would be inappropriate to the other.   So, the clause relating to the practice and jurisdiction of courts does not require that the practice and jurisdiction of courts of record, aldermen and justices of the peace shall be identical.   They must be uniform in each class.   It is equally clear that the clause relating to the affairs of counties, cities, townships, wards, boroughs and school districts, recognizes them as distinct classes.   Laws applicable to one would be absurdly inappropriate to another. All that is required is, that laws shall apply to all of such class and relate to affairs of that class, so that we may have one set of laws relating to counties, another to cities, etc.   The same rule would therefore apply to the creation of offices in these several classes of municipal organizations and prescribing their duties.

The same principle would lead to a proper construction of the provisions as to laying out, opening, altering or maintaining roads, highways, streets or alleys, and vacating roads, town plots, streets or alleys.   The words, roads, highways, streets and alleys, do not refer to the same subject matter, and these clauses do not require that the same law shall be applicable to all.   It is true that these terms are sometimes used indiscriminately one for the other, but in common acceptation they have clearly defined distinctions.   A road is defined to be ground appropriated for traveling, forming a communication between one city, town or place and another; a street, a paved way or road, but in usage any way or road in a city; an alley, a narrow passage or way in a city as distinct from a public street; a highway, a public road.   These are the definitions given in Webster, and they are substantially the same as given by other authors.   A highway, however, has a broader signification, including all public ways by land or by water, by foot, teams or machinery. Railroads, canals, rivers and bridges are highways as well as ordinary roads.   In speaking of roads one might be understood as including streets; Sharett's Road, 8 Pa. 92; but, in using the word street or alley, it would not ordinarily be understood as referring to roads.

Roads as thus understood are so essentially different from

Opinion of Court below.

streets, that they clearly require different proceedings in open-
ing and maintaining them.   The proceedings for opening pub-
lic roads through country districts by petition setting forth the
termini only, and leaving to viewers the determination of the
route between those points, and the fixing the width by the
court, would be clearly insufficient for the location and width
of public streets and alleys.   And the provisions for maintain-
ing country roads by supervisors who should call upon the cit-
izens to work out their road taxes, would be an inadequate
means of maintaining streets in a populous city.   The consti-
tution should be construed in recognition of these distinctions,
and therefore it must be held to authorize legislation as to the
different classes of municipal bodies, and to authorize legislation
as to roads and streets, both as to their opening and mainte-
nance.   It will be found that the Supreme Court has not re-
stricted but has enlarged this view, by recognizing the right to
classify cities and counties for some of these purposes.

—After reviewing Wheeler v. Philadelphia, 77 Pa. 338;
Kilgore v. Magee, 85 Pa. 401; Ayars' App., 122 Pa. 266;
Reading City v. Savage, 120 Pa. 198; s. c. 124 Pa. 328; Phil-
adelphia v. Haddington Church, 115 Pa. 291; Ruan St., 132
Pa. 257; Shaaber v. Reading City, 133 Pa. 643, and Spring
St., 112 Pa. 258, the court continued:

From these cases, it appears that the power to lay out and
open streets is a municipal function, but the assessment of
damages for property taken must be by general law, because,
as said in Ruan St., 132 Pa. 278, " The compensation due the
property holder for an invasion of his close, under the right of
eminent domain, is a subject as exclusively within the jurisdic-
tion of these courts as an indictment for a crime or an action
trespass quare clausum fregit.   The only connection the city
has or can have with such a proceeding is as a party to the
litigation because liable to pay the damages assessed."

In Wyoming St., Pittsburgh, 137 Pa. 494, the question in-
volved was the validity of the assessments made by the city of
Pittsburgh for the cost of grading and paving certain streets of
the city, the work having been done and the assessment made
under the provisions of the act of June 14, 1887, P. L. 386.
The court held that the assessments were illegal, because they
were made by a board of viewers therein provided for.   The

opinion severely criticises the act in many of its details, and concludes as follows: "We therefore content ourselves with saying that so much of it as relates to the creation, functions, powers and compensation of the board of viewers, is in plain violation of § 7, article III. of the constitution, and cannot be sustained. These provisions do not relate to any municipal function or officer, but to the jurisdiction of and practice in the courts of law of Allegheny county. They fasten upon such of the citizens of the commonwealth as are owners of property, in a city of the second class, a new, inconvenient, injurious and despotic system for the assessment of damages done by the exercise of the power of eminent domain, to which citizens in other parts of the state are not subjected." Thus far, the opinion is in accord with the ruling in Ruan St., and would render nugatory all action by this board in assessing damages for property taken, injured or destroyed in opening or grading streets, which matters, however, were not directly involved in these cases. But the case goes further and says: "They fasten upon lotholders who are assessed benefits, a new, inconvenient, injurious and despotic system for the assessment of benefits, to which citizens in other portions of the state are not subjected."

Of course, this decision having been made in reference to the board of viewers, who made the assessment in the cases now in controversy, must be accepted as conclusive, and the assessment so made or threatened, and the filing of liens upon such assessment must be restrained, unless some other mode of assessment is authorized by law. But we are asked to go further, to declare void the acts of June 14, 1887, P. L. 395, and May 16, 1889, P. L. 228, and restrain further prosecution of the improvements. It will therefore be necessary to further consider the effect of this decision.

It was clearly not intended to question or modify the rulings previously given by the Court in the opinion delivered by the same Justice in Ruan St. and Shaaber v. Reading City. In them, we find, as one of the recognized municipal functions and a proper subject of classified legislation, the paving and grading of public streets; and sewers would certainly come within the same ruling: Fisher v. Harrisburg, 2 Gr. 291. This being the case, it would follow that the cost and expense of such improvements could properly be provided for by the same means.

Opinion of Court below.

They have always been treated as proper municipal charges and the proper subject for local assessment upon properties benefited, either by foot front or actual benefit, and this both before and since the new constitution. It was provided for boroughs in the general borough act of 1851, and for cities of the third class by the act of 1874; and such assessments have been sustained in numerous decisions as late as Harrisburg v. McCormick, 129 Pa. 213. It would therefore seem to be the proper subject for classified legislation as an incident to the improvement of municipal streets. These assessments have usually been made by corporate officers, as in case of street grading in boroughs, or by viewers appointed by councils, as in the cases of cities of the third class, and many cities acting under special charters before the adoption of the new constitution. We know of no case in which it has been held that such assessments must be made by viewers appointed by the court. Such assessments differ essentially from those for damages by taking or injuring of property. The last depend upon the right of eminent domain, while the others depend upon the taxing power: Wolf v. Philadelphia, 105 Pa. 25; Michener v. Philadelphia, 118 Pa. 535.

It is therefore not probable that it was intended to hold that municipal corporations are required to resort to the courts for assessment of benefits to pay the cost of municipal improvements. It is not so expressed. We therefore conclude that the clause of article III., to which Justice WILLIAMS refers, is that relating to judicial proceedings, and the clause of the Bill of Rights which he regards as violated, § 11, which provides that " All courts shall be open, and every man for an injury done him in lands, goods, person or reputation shall have remedy by due course of law." The first is violated by the special proceedings as to the collection of liens, and the last by the fact that appeals are restricted to one court, and the other provisions which are regarded as unusual and despotic.

Some of the objectionable features of the act of 1887 have been eliminated by the act of 1889, but the same general system is retained and the same board of viewers authorized to make assessments, so that if one falls the other will fall with it. Without making any special reference to the various provisions of the act, an examination will show that each and every power is so dependent upon that for the assessment of benefits

that no consistent result can be worked out without it. We must therefore hold that the entire acts of 1887 and 1889 are unconstitutional and void.

This would remit the city to its power as provided by previously existing legislation. This is found in the act of January 6, 1864, and its supplements. By this act, councils were authorized to open, grade and pave streets. But, as to the district in which the streets in question are located, this power was, by the act of April 1, 1868, only to be exercised upon petition of a majority in interest of the owners whose property is situated or abuts thereon, which was not presented in either the cases of Gillespie or Whitney. As this is jurisdictional, as held in Philadelphia v. Walter, 69 Pa. 365, the power fails; at least, so far as to the taking of property in the one case and assessments of benefits in the other. The same act gives to councils power to construct sewers whenever they may deem the same necessary, and collect the costs and expenses thereof by assessment upon property benefited, to be made by assessors appointed by councils. This power of assessment was transferred to the board of viewers to be appointed by the Court of Quarter Sessions under the acts of May 13, 1871, P. L. 840; March 20, 1873, P. L. 325. This is substantially the same board of viewers, appointed in the same manner, and having the same powers, as the board under the act of 1887. If we are right as to the reasons for holding it to be illegal, they will apply as well to the board under these acts, and it must be held to be illegal.

As to grading of streets, the act of 1864 provided that the cost should be assessed by foot-front, and Centre Avenue being located in a rural district, this mode of assessment could not be adopted: Seely v. Pittsburgh, 82 Pa. 360. There would appear to be no objection to assessing the cost of sewers under the act of 1864, unless the ordinance should fall under the prohibition of the act of May 1, 1876, P. L. 94. This is a general act which would not repeal any local laws, unless so expressed or implied. It is not so expressed, but by implication it imposes a condition upon all cities inconsistent with the old laws, at least as to the power to impose the cost upon property owners, and therefore prevents any local assessment of the cost of sewers in the city of Pittsburgh. But the power to

Opinion of Court below.

grade and pave streets and construct sewers, was given to the city of Pittsburgh by its original charter, the act of March 18, 1816, which conferred upon it the powers of Philadelphia under the act of February 18, 1769, 1 Sm. L. 284, and was expressly given by the act of April 6, 1867, known as the Consolidation Act. As to the construction of sewers, it has been held to be an incidental power of municipal corporations: Fisher v. Harrisburg, 2 Gr. 291.

Though the assessments are void, it does not follow that the exercise of the power to grade and pave streets and construct sewers does not exist. At all events, it is not necessary to so decide in this case. The only special interest the plaintiffs have is to protect their property from illegal assessments, and they have no equity to require that the whole proceedings should be declared void, especially in view of the fact that large expenditures have been made with the knowledge of plaintiffs. And, besides, to stop the work now, would leave those large improvements unfinished and worse than useless, as they now actually operate as obstructions to passage of the streets and drainage of the neighborhood. If the city chooses to proceed to the completion of the work, running the risk of paying the cost, the plaintiffs have no reason to complain.

The conclusion to which this brings us, is that all proceedings in the case of Gillespie, the opening of Lexington street, must be restrained; and that, in the cases of Whitney and Atterbury, the assessment of benefits by the board of viewers and the collection of the same as against the property of plaintiffs, must be restrained.

Decrees will be entered in accordance with this opinion.*

—A decree was then entered in each of the three cases, perpetually restraining the city of Pittsburgh, its agents or employees, from causing assessments to be made against or collected from the property of the plaintiff.[2]

Whereupon the defendants took the appeals to Nos. 68, 69, 70, specifying in each case that the court erred:

2. In entering the final decrees.[2]

---

*A parenthetical note at the end of the opinion, as printed in the paperbooks, stated: " This opinion was filed in all three of the equity cases, and is also intended to cover the application for the appointment of viewers in the Court of Quarter Sessions."

3. In not dismissing the bills at the costs of the plaintiffs.

And the plaintiffs took the appeals to Nos. 83, 84, 85, specifying in each case that the court erred:

1. In not granting injunctions against the continuance of the public works mentioned in the respective bills.

2. In not decreeing that the city had no power or authority to carry on said public works.

3. In not decreeing the act of June 14, 1887, P. L. 395, relative to the government of cities of the second class, to be null and void.

—The seven appeals embraced in this report were argued together.

*Mr. D. T. Watson* and *Mr. W. C. Moreland*, City Attorney, (with them *Mr. W. B. Rodgers*), for the city of Pittsburgh et al., appellants in Nos. 67–70, and appellees in Nos. 83–85:

1. The decision of this court in Wyoming St., Pittsburgh, 137 Pa. 494, does not strike down the whole of the act of June 14, 1889, P. L. 386.    Giving the ruling of that case its full effect, it strikes down the board of viewers, only, and the powers given to that board, and leaves unaffected the other portions of the act, unless the striking down of the board necessarily carries all the other parts of the act with it.    Such a result does not necessarily follow: Pittsburgh's App., 115 Pa. 4; Norton v. Shelby Co., 118 U. S. 442.    In assuming that the unconstitutional parts of the act cannot be stricken out and the rest allowed to stand, the court below overlooked an important fact, viz., that the act in question was but one of a series of acts granting power to the city of Pittsburgh to open, grade and pave streets, etc., and that prior to its passage the city had a perfected system of machinery for the collection of the cost and expenses of such improvements, which the act did not repeal except in so far as it supplied the same.    The act changed only some of the details of the system ; and if parts of the act, seeking to make such changes, are unconstitutional, the only result is that the details sought to be changed still stand as if the act had never been passed.    The acts of May 13, 1871, P. L. 840, and March 20, 1873, P. L. 327, providing for the appointment of a board of viewers, if not repealed, are still valid, notwithstanding the adoption of the constitution : Lehigh Iron Co. v. Lower M. Tp., 81 Pa. 482.

Arguments.

2. The court below held that the ordinances in question were void, because the act of May 1, 1876, P. L. 94, was in force when they were passed, and under that act a preliminary estimate of benefits by an engineer and board of viewers was a condition precedent to the validity of such ordinances. We reply : (*a*) This provision of the act of 1876 was superseded by the act of June 14, 1887, P. L. 386. (*b*) The object of such preliminary estimate has been answered in these cases, by the undenied averment of the bills that the benefits of the improvements are sufficient to pay their costs and expenses. (*c*) The act of 1876 was expressly repealed by the act of May 27, 1889, P. L. 387, and as the complainants never raised the question during the life of the act of 1876, they should not now, after much of the work has been done, be permitted to set up such a technical defence to assessments for benefits. (*d*) The preliminary view and estimates, under the act of June 14, 1887, P. L. 386, were made by viewers, who were such de facto at least, and the property owners should not be allowed to object now for the first time : Commonwealth v. McCombs, 56 Pa. 438 ; Risley v. St. Louis, 34 Mo. 416. The court held, also, that by the requirement of § 11, act of April 1, 1868, P. L. 565, a majority in interest of the property owners must petition for the improvement, was not repealed by the act of June 8, 1881, P. L. 68, nor by the act of June 14, 1887, P. L. 386, and that for want of such petition the ordinances involved in these cases were void.

3. But the act of 1881 did repeal that of 1876 : Twenty-second St., 102 Pa. 108. However, the act of June 14, 1887, P. L. 386, certainly effected such repeal, the portion thereof which authorized the passage of such ordinances on petition of one third in interest of the property owners, not being affected by the decision in Wyoming St., Pittsburgh, 137 Pa. 494. So much of the act of June 14, 1887, P. L. 386, as relates to the filing of liens for municipal improvements, and the collection thereof, is not in conflict with § 7, article III. of the constitution, as, necessarily, classifications of liens and separate legislation as to the collection of such liens by proceedings in rem, are proper; Roup's App., 81* Pa. 211; Kilgore v. Magee, 85 Pa. 401.; Reading City v. Savage, 124 Pa. 328; Harrisburg v. McCormick, 129 Pa. 213 ; Chester City v. Black, 132 Pa. 568;

Hammett v. Philadelphia, 65 Pa. 155; Ruan St., 132 Pa. 257; Shaaber v. Reading City, 133 Pa. 643. Local taxation for local benefits is constitutional: Hammett v. Philadelphia, 65 Pa. 155; Washington Ave., 69 Pa. 352; Seely v. Pittsburgh, 82 Pa. 360; Saw-mill Run Bridge, 85 Pa. 169; Orphan Asylum's App., 111 Pa. 143; Centre St., 115 Pa. 252. Hence, class legislation, providing a mode of making and collecting such assessments, is constitutional. Wyoming St., Pittsburgh, 137 Pa. 494, and Philadelphia v. Haddington Church, 115 Pa. 291, can be reconciled with Reading City v. Savage, 124 Pa. 328, and the other cases we have cited, by holding that the criterion of the constitutionality of municipal class legislation is, whether or not it relates to purely municipal matters.

4. The act of June 14, 1887, P. L. 395, for the government of cities of the second class, is constitutional. It is too late to dispute the power of classification: Ruan St., 132 Pa. 273. The objection made that the dates in the act render it of local application, is answered by the fact that the act of May 23, 1874, P. L. 230, had already divided the cities of the state into classes, and it was proper to recognize and make provision for existing cities of the second class. If the dates are inapplicable to cities coming into that class in the future, the things required can be done nevertheless, or further legislation can be procured. Nor does the act infringe the provisions of § 6, article III. of the constitution. So far as powers and duties of officers, boards and departments, created by ordinance, are transferred to the new officers and departments created by the act, clearly there is no such violation, as an ordinance is not a law within the meaning of the constitutional provision prohibiting the amending, extending or conferring of laws without re-enactment at length. And, in so far as the act transfers powers and duties, conferred by prior statutes, to new officers who are to take the place of others whose offices are abolished, it does not fall within the class of legislation the evil of which the constitution intended to guard against: People v. Mahoney, 15 Mich. 481; Denver C. R. Co. v. Nestor, 10 Col. 403; Katham v. New Orleans, 11 La. Ann. 145. Moreover, if §§ 3, 5 and 6 were eliminated from the act, the other portions of it contain sufficient affirmative grants of power over all the subjects of city government. And we might rest upon the pro-

Arguments.

position that, as the councils are legal bodies, the ordinances in question are legal ordinances, irrespective of the constitutionality of this act.

*Mr. W. C. Moreland*, City Attorney, filed a separate brief, presenting a historical review of the legislation relative to public improvements in the city of Pittsburgh, citing: Acts of April 6, 1850, P. L. 407; May 16, 1857, P. L. 541; April 22, 1858, P. L. 471; January 6, 1864, P. L. 1131; May 13, 1871, P. L. 840; March 14, 1872, P. L. 360; March 20, 1873, P. L. 325; June 14, 1887, P. L. 386; May 16, 1889, P. L. 228. The brief also cited: Pittsburgh v. Walter, 69 Pa. 365; Olds v. Erie, 79 Pa. 380; Pittsburgh v. Cluley, 66 Pa. 449; Pittsburgh v. Irwin, 85 Pa. 420; Hershberger v. Pittsburgh, 115 Pa. 78.

*Mr. Johns McCleave* and *Mr. M. A. Woodward*, (with them *Mr. J. H. White*), for Whitney, Atterbury and Gillespie, appellees in Nos. 67–70, and appellants in Nos. 83–85:

1. We complain of the decision of the court below upon two points: (*a*) as to the right of the city and the other defendants to continue operations in opening streets, and making street and sewer improvements, under ordinances and contracts enacted and entered into in pursuance of the act of June 14, 1887, P. L. 386; and (*b*) as to the constitutionality of the act of June 14, 1887, P. L. 395. Upon the first point, the position of the court is that the city has general power to make such improvements at its own risk and expense; but the continuance of the work, under a pretence of authority to assess abutting properties for its cost, renders the properties unmarketable, and our bills are therefore not destitute of equity. The fact that large expenditures have already been made, does not affect the question, as there is nothing in our relations to the improvements which implies any waiver of our rights.

2. The ordinances and contracts in relation to these improvements are void, because the councils enacting the ordinances were organized under the act of June 14, 1887, P. L. 395, relating to the government of cities of the second class, and the officer who executed the contracts was holding an office created by that act; and, inasmuch as said act is unconstitutional and

void, neither the councils, nor such officer acting under them, had any legal power or authority to act for or on behalf of the city.   We contend that the act referred to is unconstitutional, because it is a local law, incapable of application to any other city or locality than Pittsburgh.   It is manifest from §§ 1, 2, 10 and 20, fixing specific dates at which essential requirements shall be complied with, that cities not having the requisite population at the date of the act are permanently excluded from its operation, as they cannot comply with the essential conditions of incorporation.   This makes it a local law: Morrison v. Bachert, 112 Pa. 322; Scranton v. Silkman, 113 Pa. 191; Scranton Sch. D.'s App., 113 Pa. 176; Davis v. Clark, 106 Pa. 377.

3. The act of June 14, 1887, P. L. 395, is unconstitutional for another reason: by §§ 1, 5, 6 and 7, powers and authorities, created and defined by previous legislation, are conferred upon new officers and departments, without even a reference to the titles of the laws thus applied to them.   To ascertain the nature and extent of the powers and jurisdiction thus conferred, it is necessary to examine a body of law found in numerous statutes passed during the preceding thirty or forty years.   These sections are in flagrant violation of § 6, article III. of the constitution: Donohugh v. Roberts, 11 W. N. 186; Titusville I. Wks. v. Oil Co., 122 Pa. 627; Barrett's App., 116 Pa. 486.   If so, the whole act must fall, because when §§ 1, 5, 6 and 7 are stricken out, we have no definition whatever of the powers or authorities of any municipal officer, and no pretence of a government can be organized.   It is no answer to say that the councils and chiefs of departments are de facto officers; there cannot be a de facto officer without a de jure office: Dillon, Mun. Corp., § 276; Norton v. Shelby Co., 118 U. S. 425.

4. The entire street act of June 14, 1887, P. L. 386, is unconstitutional and void.   This follows from the decision in Wyoming St., Pittsburgh, 137 Pa. 494, holding the portions of it which relate to the board of viewers to be invalid.   While it is true that part of a statute may stand although another part of it be unconstitutional: Cooley's Const. Lim., 215; yet, if the striking out of the unconstitutional part would defeat and destroy the entire legislative intent in the enactment of the

Arguments.

statute, the whole act must fall: Commonwealth v. Potts, 79 Pa. 164. In the statute in question, the exercise of the entire power conferred by the act is made to depend upon the action of the board of viewers, and without such board no power to open, grade or pave streets, or to construct sewers, would have been given. Striking out, then, the sections giving those powers, nothing remains except the sections relating to liens, and those are clearly local laws, violating § 7, article III. of the constitution: Davis v. Clark, 106 Pa. 377; Philadelphia v. Haddington Church, 115 Pa. 291; Ruan St., 132 Pa. 257. Municipal functions which are the same in all municipalities, are not the proper subjects of class legislation.

5. These ordinances cannot be sustained under the local laws in force prior to June 14, 1887, because: (*a*) On their face they refer to the act of 1887 and direct the assessments to be made in accordance therewith. (*b*) The preliminary proceedings required by the act of May 1, 1876, P. L. 94, and §§ 2, 3, act of January 6, 1864, P. L. 1131, have not been had. (*c*) In the grading and paving case, the property is rural in character, and the act of 1864, which is the only prior law authorizing assessments for grading and paving, and requires them to be by the foot-front rule, cannot constitutionally be applied to such property: Washington Ave., 69 Pa. 352; Seely v. Pittsburgh, 82 Pa. 360; Kayser v. Weise, 85 Pa. 366; Philadelphia v. Rule, 93 Pa. 15; Scranton v. Coal Co., 105 Pa. 445. (*d*) By the act of April 1, 1868, P. L. 565, a petition of a majority in interest of the property owners is required to give councils jurisdiction to open a street, in the territory where the plaintiffs live. Pittsburgh v. Walter, 69 Pa. 365, and the act of June 8, 1881, P. L. 68, does not repeal that requirement. (*e*) The Thirty-third street sewer is constructed principally through private property, and § 12, act of March 20, 1873, P. L. 325, attempting to authorize such construction, is unconstitutional. (*f*) The board of viewers provided for in the acts of May 13, 1871, P. L. 840, and March 20, 1873, P. L. 325, possessed all the disqualifications of the one appointed under the act of 1887; and, moreover, it is not within the judicial power of any court to appoint such a board: Hayburn's Case, 2 Dall. 409: United States v. Ferreira, 13 How. 40.

*Mr. W. J. Howard*, being permitted by the court to intervene as a person interested in one of the questions involved, submitted a brief in support of the proposition that the provisions of the acts of June 14, 1887, P. L. 386, and May 16, 1889, P. L. 228, imposing the cost of opening, widening and straightening highways, in cities of the second class, upon the property benefited thereby, are wrong in principle and contrary to the letter, spirit and intent of § 8, article XVI. of the constitution, citing: Washington Ave., 69 Pa. 352; Guest v. Brooklyn, 69 N. Y. 506; McMasters v. Commonwealth, 3 W. 292.

APPEALS BY PITTSBURGH, FROM C. P. NO. 1.

OPINION, MR. JUSTICE WILLIAMS:

These appeals are part of a series of cases brought into this court in order to determine the extent to which the city of Pittsburgh is affected by the decisions in the appeals of Wilbert, Engel et al., made in January last: Wyoming St., Pittsburgh, 137 Pa. 494. The importance of these cases to the officers and the property holders of the city, was such that we felt it our duty to facilitate the final hearing. We accordingly transferred them to the Eastern District, advanced them on the calendar, and have given them a full and patient examination. We acknowledge our indebtedness to counsel for the results of their research, and for the ability and fairness with which, both in their oral and written arguments, they have treated the questions involved.

The court below enjoined the city against the making of awards in favor of those damaged by the improvements in progress, and the assessment of such damages, with the costs, against property benefited, and also against the collection of liens entered upon such assessments already made. An appeal from that decree raises two questions: First, is the rule laid down in the appeals of Wilbert et al. to be adhered to? Second, if so, are there not enough of the provisions of the acts of 1887 and 1889, known as the "street laws," remaining, to enable the city to proceed with its improvements at the expense of property benefited by them? The first of these questions was not seriously pressed in the argument. Two of our brethren did not concur in all the reasons given for the judgment in the appeals of Wilbert et al., but they concurred in the judg-

ment entered. We think it stands on solid ground, and shall not enter upon a re-examination of it. Referring to it as the starting point from which to begin the examination of this case, we will consider very briefly the second question, viz., to what extent are the acts of 1887 and 1889 affected by the decision in that case?

It will be seen upon looking into these acts, of which we will speak as the "street acts," that they were intended to establish a system to be made use of by the city, for opening and grading streets and making other municipal improvements at the expense of property in their immediate neighborhood which would be increased in value because of them. A somewhat different system had prevailed previously. The foot-front rule was in use in some portions of the territory embraced within the city limits. In other portions, this was not applicable, because the property in them was rural in character. The street acts undertook to provide a uniform system and apply it to all improvements within the territory of the city. It was based on the assumption that wherever one lotowner was injured by taking his land, or by a change of grade in the street bounding it on either side, some other lotowner was correspondingly benefited, and ought therefore to pay his neighbor's loss. Proceeding upon this theory, the street acts provided for a preliminary inquiry in every case where a new improvement was projected, to ascertain whether damages would be inflicted upon any lotowner by the improvement if made, and whether corresponding benefits would result to other lotowners therefrom. This inquiry was made by the board of viewers. If they reported that the damages would exceed the benefits, then, as we understand the street acts, the project was for the time abandoned. If they reported that the benefits would be sufficient to pay the damages and expenses, then the city proceeded to direct the improvement to be made. After this was done, the viewers made a detailed estimate and award of damages sustained by those whose property was taken or injured, and reported the same to the city. The aggregate of these awards, with all the costs and expenses, was then to be assessed upon the property benefited. When the assessment was completed, it was returned to the councils for adjustment and collection. If not paid on notice, municipal liens were entered against the several pro-

perties assessed, and proceedings were taken to collect the same by levy and sale by the sheriff.

The board of viewers is thus made an indispensable part of the system. Without its agency, no improvement can be undertaken except it be by the city and at its own cost. An ascertainment of damages cannot be had except through the action of the board of viewers. The assessment of benefits must be made by it. The report of the board is the basis on which liens for the sums assessed as benefits must rest. When the work of the board of viewers is taken out of the system, all that depends upon that work goes with it, and the system itself is literally eviscerated. The few detached and unrelated provisions that might remain are without significance or value and ought not to survive the system to which they belonged. The system provided by the street acts must fall as a whole. The way will thus be clear for the enactment of a street law for cities of the second class. As nothing remains of the system provided by the acts of 1887 and 1889, it is hardly necessary to say that its authority cannot survive for any purpose. All the preliminary reports made by it fall, and no improvements can be ordered under them. All the assessments of damages and benefits fall, and all the uncollected liens, entered upon these assessments, go with the assessments. All work done or to be done upon these improvements, as the law now stands, must be paid for by the city. All the damages inflicted upon lotholders must be recovered from the city.

There is no possible escape from the dilemma in which the city is placed by the unfortunate legislation of 1887 and 1889 except through the legislature, and we have made haste to dispose of these cases in order that there might be time for that body to give proper consideration to the subject. There are two cities of the second class at this time. At the end of the present decade, the city of Scranton, and probably one or two more, may be brought by their growth in population into it. A system should be prepared for cities of the second class that shall not undertake to transfer the powers of the courts of law to city councils, or to regulate the practice in the courts by reference to the town or city in which they are held; that shall not deny to the citizen free access to the courts for redress of injuries, and that shall not treat the ascertainment of

Opinions of the Court.

damages sustained by a citizen, by reason of an entry upon his land under the power of eminent domain, as a matter of municipal control. We do not doubt the readiness or the ability of our brethren who compose the legislative department of the government to provide such a system in the time still at their disposal. Until this is done the injunctions must remain in full force.

> The decrees appealed from are affirmed, and the appeals dismissed at the cost of the appellant.

APPEALS BY WHITNEY, ET AL.

OPINION, Mr. JUSTICE WILLIAMS:

These are cross-appeals from the decrees just considered on the appeals of the city of Pittsburgh. The appellants contend that the injunctions which were issued did not go far enough, because they did not restrain the city from completing the improvements entered upon under the street acts of 1887 and 1889, even though done at its own cost. The position is taken that the act of June 14, 1887, [P. L. 395,] entitled "An Act in relation to the government of cities of the second class," is unconstitutional, and that the heads of departments selected under its provisions are not competent to contract or bind the city in any manner whatever. The question presented by these appeals is therefore over the constitutionality of that act, and the organization of the city of Pittsburgh as a city of the second class.

It is urged that §§ 1, 2, 10 and 20 make the act local, by fixing dates at which acts necessary to put the government in operation are to be done, which were possible only to one city, the city of Pittsburgh, and which are impossible to the city of Allegheny, which has come into the class since the act was passed. The reply to this objection is, that, at the date when the act became a law, there was but one city in the second class. The provisions of the act were general in their character. They related to all cities of the second class. If there had been several such cities, the terms employed would have applied to all alike. It was necessary, in order to give effect to the change in the system of municipal government, that a definite time should be fixed upon at which the change should take place and the new system be put in operation. The trouble with the

act is not that it made such a provision for cities then entitled
to a place in the second class, but that it did not also make
similar provisions for cities that should thereafter be entitled
to come into the class.  We cannot hold, however, that the
failure to provide a date for the organization of cities after-
wards to come into the class, deprives such cities of the ben-
efit of the law, or renders it local, and so, inoperative, in the
cities to which it would otherwise be applicable.  It may be
that dates following the proclamation of the governor showing
a given city to be entitled to become a city of the second
class, corresponding with the dates following the passage of
the act which were fixed for the cities then in the class, would
be properly adopted.  Something like this was done in Shurley
v. Railroad Co., 121 Pa. 511.  But,. if this should be thought
inadmissible and further legislation should be resorted to, we
do not see that the conclusion of the appellants would follow.
The act of 1887 is general in terms, and it is clearly applicable
to all the members of the class as it was then composed, and
answered the test laid down in Weinman v. Railway Co., 118
Pa. 192, and kindred cases.

The other position taken is, that §§ 1, 5, 6, 7 and 9 offend
against § 6, article III., of the constitution, which declares
that "no law shall be revived, amended, extended, or con-
ferred by a reference to its title only, but so much thereof as
is revived, amended, extended, or conferred shall be re-enacted
and published at length."  The first section is thought to vio-
late this provision, by the declaration that the legislative pow-
ers of cities of the second class shall be vested as heretofore in
two branches.  This does not extend or confer powers, pre-
viously exercised in some other way, to the two branches of
the councils, but leaves the legislative power just where it was
before, with no change in its extent, in the body exercising it
or in the name or title of that body.  The city councils pos-
sessed the power before the city came into the second class,
and when it came it brought its councils with it, just as it
brought its mayor, with their powers and titles unchanged.
Such a declaration does not violate the constitution in any par-
ticular.  The same thing may be said of the ninth section,
which declares that certain offices named, including that of
city treasurer and controller, " shall remain as heretofore, ex-

cept as herein otherwise provided." These offices, with the incumbents, came also with the city into the new scheme of government, and became a part of it, as did the mayor and councils. So far as new duties were put upon them, or old ones taken away, the act made the necessary provisions; but where no change was made, the officers assumed the responsibilities and discharged the duties belonging to them, just as though no change in class had taken place. Nothing was added to or taken from their functions or powers, except by express words.

The objection made to the fifth, sixth, and seventh sections is much more serious. These sections do undertake to confer powers, previously exercised by a number of officers whose offices are discontinued, upon the heads of departments created by the act. They undertake to extend to these new officers all the acts of assembly relating to the duties and powers of all these unnamed and abolished offices, without even a reference to their dates, their titles, or their subject matter. To understand what was, and what was not within their control, it would be necessary to digest all the local laws relating to all the officers whose functions are thus gathered up and dropped into the hands of the " heads of departments." This mode of defining the powers of a newly created officer is in violation of the letter and the spirit of the constitutional provision, and cannot be sustained: Titusville Iron W. v. Oil Co., 122 Pa. 627 ; Donohugh v. Roberts, 11 W. N. 186.

The heads of departments are not wholly stripped of official functions and authority by this holding, for in the fifteenth, sixteenth, and seventeenth sections, certain general powers in their respective departments are conferred upon them, within which they may properly act and bind the city. It is nevertheless true that supplementary legislation is needed in order that these officers may be able to assume the importance in the management of municipal affairs, which the system of government for cities of the second class plainly contemplates. The seventh section is not as objectionable as the fifth and sixth. It professes to confer upon five magistrates the right to exercise for certain purposes the same police powers as are possessed by the mayor. The police power of the mayor is not diminished. That remains as before, but for certain purposes five

magistrates have the right to exercise the same police powers. The police power is a common-law power. The legislature may properly confer it upon a newly created office by general words, for that reason. But, if the mayor exercises powers created and conferred by statute, in addition to the general police power of which we have spoken, such statutory powers could not be conferred on the magistrates by such general words as are employed in this section. It may be that the mayor's police powers are only such as fall properly within the general or common-law meaning of the words. If so, we do not see why this section may not stand.

The eighteenth section authorizes the councils to create new departments in the city government and to define their powers. This cannot be sustained. The legislature must settle the system of government for each class of cities, and it must be the same for each and every member of each class. No city in any class can change the number of or the distribution of powers among the departments into which its government is cast by the legislature. If this were not so, no two cities in the same class would long retain the same form of municipal government, and general legislation for the class would, on many subjects, become impossible.

The first proviso in the twenty-third section fixes the minimum valuation to be put on real estate in all cities of the second class. This may be a convenient mode for the assessor, and a desirable one for the city; but we do not understand how the legislature can fix an arbitrary valuation of property in one city or class of cities wholly unlike that in actual use in all other cities or classes of cities. The constitution requires that taxes shall be uniform and assessed under general laws. We do not doubt the power of the legislature to adopt such a standard of valuation for the whole commonwealth. What we do doubt, is the power to adopt it for a city or class of cities. If this provision for cities of the second class is good, then there might be another standard of value adopted for cities of the first class, another for cities of the third class, and so on through the boroughs and townships, until any approach to equality in taxation would be rendered impossible.

Our attention has not been called to any other sections of the act, and it only remains for us to state the result of our conclu-

sions in their practical effect upon the city, in as few words as possible :

1. The city of Pittsburgh is now legally organized as a city of the second class under the act of June 14, 1887 ; and it must stand on the system of government provided by that act for the class of cities to which it belongs.

2. The mayor, councils, treasurer and other officers, who came with the city into the new system and became a part of it, continue in the possession of the powers and subject to the duties conferred and imposed upon them by the laws in force relating thereto.

3. The heads of departments are newly created offices that must look to the act creating them for their powers. The offices were legally created and are de jure offices. The officers were legally selected, and are therefore de jure officers. The grant of powers to them is defective, and they possess none except such as are conferred by the fifteenth, sixteenth, and seventeenth sections, which are general, and in many respects indefinite and inadequate.

With a little supplementary legislation, in aid of the heads of departments, we do not see why cities of the second class will not be in possession of a well-equipped municipal government. The court below was right, therefore, in refusing to tie up the hands of the city, so far as work was necessary for the comfort and convenience of its citizens, and done at its own cost.

The appeals are dismissed, at the cost of the appellants, respectively.

APPEAL BY PITTSBURGH, FROM QUARTER SESSIONS.

OPINION, MR. JUSTICE WILLIAMS:

This case presents a subject for consideration not involved in the appeals of the city of Pittsburgh in the injunction cases just considered, or in the cross-appeals of Whitney et al. from the same decrees.

The city came into the Court of Quarter Sessions with a petition reciting the following facts, viz.: That Pittsburgh was a city of the second class ; that it had opened and graded streets and constructed sewers under the provisions of the acts of 1887 and 1889, and had others in the process of construction and opening or grading; that the said acts provided for an ascer-

tainment of the damages done by such improvements, and an assessment of the same as benefits on property in the neighborhood of the improvements; that the board of viewers, created by said acts for this purpose, had been declared unconstitutional by the decision rendered in the appeals of Wilbert and others, and their assessments set aside. On these facts it asked the court to appoint viewers under the act of 1864, and its supplements, to ascertain the damages done to those injured by the improvements, and assess benefits upon those whose property was increased in value by them.

If the petition was intended to assert that the acts of 1887 and 1889 made any general provision upon the subject of damages and benefits, not connected with and dependent on the particular system provided for their ascertainment by the board of viewers, it is not sustained by an examination of the acts. The provision relating to the subject is in these words: "The value of the property taken, or damage done to property thereby, shall be levied and collected upon the several properties benefited by such improvement in the manner provided by section twelve of this act." No provision is found not coupled with a reference to the board of viewers, which gives any direction upon the subject of damages or benefits. The method for the assessment of damages and benefits which was provided has fallen under the weight of Wilbert's Appeal. The whole system built upon that method has fallen under the decision in the appeals of the city of Pittsburgh in the injunction cases just decided. The acts of 1887 and 1889 can therefore afford no help to the city, for they are literally expunged from the statute book.

Did the act of 1864, and its supplements, authorize the appointment of viewers asked for? Under the act of 1864, neither the Quarter Sessions nor the Common Pleas was authorized to appoint viewers. The city appointed her own appraisers to estimate the injury she inflicted on her citizens by her own entry on their land. This body reported to the city, not to the courts. The city and not the courts of law had immediate appellate jurisdiction, and sat to hear and determine, in the first instance, the claims against her upon which she had already passed by her board of viewers. The act of 1873 authorized the Quarter Sessions to appoint viewers, but the pre-

Opinions of the Court.

liminary examination was made, as we understand, by the city
engineer, who was required to give notice to the owners of
property affected, at least thirty days before the time fixed for
opening, etc.   Upon the letting of any contract, it was made
the duty of the city engineer to assess " fifty per cent of the
cost thereof, which shall be payble within thirty days from the
commencement of the work, and the remainder of the cost
thereof shall be assessed at the completion of the work; both
of said assessments shall be collected and liens therefor shall be
filed and proceeded on as now provided by law."   An assess-
ment under the act of 1873 is not practicable, because none of
the proceedings have been under or in accordance with the di-
rections of that act.   These improvements were authorized on
the petition of one third of the property owners, under the act
of 1887, and they have been conducted in accordance with the
directions of that act and the act of 1889.   It is clear, therefore,
that the system provided by the act of 1864, and its supple-
ments, is wholly inapplicable to these improvements in their
present condition, even if we should concede that the system
is still in existence for any purpose.   We see no relief for the
city from the dilemma in which its unconstitutional street law
has placed it, except through the legislature.   We should be
glad to escape this conclusion if we could, but we cannot.
The responsibility for the resulting inconvenience does not
rest on us.

The learned judge of the court below reached a correct con-
clusion.   He could not appoint viewers under the act of 1887,
if in force, for that act took the jurisdiction from the Quarter
Sessions and gave it to the Common Pleas.   He could not ap-
point them under the act of 1864, and its supplements, because,
assuming them to be in force for this purpose, their directions
had not been complied with in any important particular.

As a new street law for cities of the second class becomes
necessary, we were asked by counsel on the argument, to assist
its preparation by indicating any other objectionable features
in the system of 1887, not directly involved in these cases.
This is an undertaking of great delicacy, upon which we should
not have entered except at the request of counsel representing
both sides, and in which we shall confine ourselves to a very

few suggestions which seem to us elementary. They are as follows :

1. A city may determine when, where, in what manner, and to what extent it will enter upon and appropriate the property of a private person in the exercise of the right of eminent domain. This is a municipal question. The constitutional requirement that just compensation shall be made to the owner, must be enforced by the state courts in accordance with general laws. This is a judicial question. The city has no more control over the proceedings, than it would have over an action against it brought to recover the price of goods sold or work and labor done.

2. The assessment of benefits is an exercise of the taxing power. The tax is defensible on the ground that it rests on an actual benefit conferred on the particular piece or pieces of property on which it is levied. It is a local tax resting on local benefit. This was distinctly ruled in the recent case of Allegheny City v. Railroad Co., ante 375. An assessment levied in order to cover all the cost of a given improvement, without regard to the actual benefits conferred by it, is simply confiscation. As an assessment is only valid because of actual benefits, it follows that these benefits should be fairly estimated. When determined, they may be collected by instalments if that seems desirable ; but the assessment or adjustment of the benefits cannot be changed when once made, except for reasons that invalidate it and require it to be made de novo.

3. The benefits to be assessed are such as are peculiar to the property assessed. A mere general increase in the value of property in that part of the city, is not enough. It must relate to the increase that is peculiar to the property liable to assessment, and is due simply to the improvement proposed.

4. This tax stands on peculiar grounds. When the benefits are assessed, a city cannot add to the assessment anything except the taxable costs incurred in its collection. All its officers are paid by salaries. The duties they perform, in connection with the streets and sewers, are such as belong appropriately to their respective offices, and are compensated by their salaries. The city solicitor receives a salary of five thousand dollars per year, and his assistant one or two thousand. He is required, by a succession of ordinances, to pay into the city treasury all

fees and commissions collected. The same system prevails in cities of the first class and in cities of the third class. The officers are paid by salaries and all fees go into the city treasury, and this is the plain intent of the constitution: See §§ 7 and 12, article V., and § 5, article XIV. See, also, § 15, act of March 31, 1876, [P. L. 17?;] § 40, act of May 23, 1874, P. L. 253. As no commission can be paid by the city or received by the solicitor for the collection of municipal liens entered upon an assessment of benefits, the payment of it by the property holder is simply a payment of the amount, whatever it may be, in aid of the taxpayers in general. If the city can collect five per cent for such a purpose, it can collect one hundred.

5. Section 31 of the act of 1887, authorizes the city to suspend work by its contractors without liability for the loss such suspension inflicts. We have no doubt that a contractor may agree that the city shall reserve such a power, and be bound by his agreement; but, it may be worth while to consider whether the legislature can authorize a city of the second class to violate its contracts without liability. Can contracts made by a city of one class, be put on different ground from contracts made by other cities belonging to other classes ?

6. Section 22 establishes a system of practice in the courts relating to municipal liens in cities of the second class. The practice may be changed in regard to particular subjects by general laws. Municipal liens is such a subject; but not municipal liens in one city or class of cities. There cannot be a different system of practice in the courts for the collection of municipal liens, for every class of municipal corporations in the commonwealth. Classification will not justify that: Ayars' App., 122 Pa. 266; Weinman v. Railway Co., 118 Pa. 192; Ruan St., 132 Pa. 257.

7. It should be remembered that while a city is to be regarded as representing the commonwealth, and acting as an instrumentality of the sovereign power for certain purposes of local government, it may and often does occupy a widely different position toward its citizens. This court has repeatedly said that when a city sells gas or water to its citizens, it enters into a contract relation with them. When it enters upon their land, under the power of eminent domain, it becomes a trespasser unless it follows the directions of the general laws re-

lating to that subject. · When it contracts with or trespasses on its citizens, it has no higher position than any other contracting party or trespasser. When, in either of these relations, it gets into the courts, it is neither greater nor better than its humblest citizen. The rules of law do not change with the name of the party to litigation. There is not one law for the rich, and another for the poor ; one for the city that commits a trespass, and another for a citizen who does the same thing ; but city and citizen stand on the same level as parties litigant. What would be thought of a law that authorized a railroad company to exercise the right of eminent domain, to appoint viewers to assess the damages their entry might inflict, to receive the report of their viewers, and sit as an appellate court to hear evidence for and against themselves, and render a judgment in their own cases which should " be final and conclusive, unless " the injured party could plant his appeal in a court of record within one half the time that is allowed for an appeal in the most trivial case from a judgment of a justice of the peace ? This, with a slight change in the name of the party taking land under the power of eminent domain, is the system which the city of Pittsburgh has enjoyed.

We have, as will be seen, ventured beyond the lines of our case in making these suggestions. We should not have done it if counsel had not led us to suppose we might thus render some service in the present situation of legislation relating to cities of the second class. We fully realize that what we have thus said is obiter. It is not the opinion of the writer only ; yet, as it is not necessary to the decision of this case, it has no judicial authority. Its value must depend on the extent to which it commends itself to the judgment of the parties interested, and of the legislative bodies to which the parties must go for the relief needed.

. What we may think upon these subjects when they are presented by an actual case, and we are able to examine them in the light which discussion and fuller reflection may throw upon them, we cannot tell. Our suggestions have been intended to call attention to the subjects to which they relate, and they express our personal views at this time.

The appeal in this case is dismissed at the costs of the appellant.