## Martin S. Eichelberger's Estate.    Appeal of Yale University.

[Marked to be reported.]

*Decedents' estates—Claim for services—Evidence.*

A claimant against a decedent's estate for nursing decedent at night was a workman employed by decedent during the day. A disinterested witness testified that when decedent began to fail physically, he told witness that he wanted claimant to stay with him at night, and he would get some one else in his place to do the day work. Witness so informed claimant, who said he would do the extra work himself, if he could get the extra man's pay. This was communicated by witness to the decedent, who said he was willing to pay claimant for the work if he could stand it. This was reported to claimant by witness, and afterwards claimant was present with decedent and witness, and agreed to do the night work for pay. The amount of compensation was not named. In the following spring decedent told witness that claimant talked of leaving him, and asked him to see claimant to get him to stay; that he would pay him for his extra night services; that he had not done it yet; but he should continue on and he would pay him; that he would give it all to him at once,—that it would do him and his family more good. *Held*, that the evidence was sufficient to sustain a finding for claimant.

*Decedents' estates—Interest on legacies.*

The rule that pecuniary legacies bear interest from the end of one year after the testator's death is not affected by the fact that distribution was delayed by a report in circulation that some female who was named claimed that she was married to the deceased, and entitled to a share in the estate.

Interest upon a legacy begins to run from the time it becomes payable, and where no time for payment is fixed by the will, the direction of the act of Feb. 24, 1834, P. L. 83, must prevail unless there be language or circumstances apparent upon the face of the will, showing that the testator could not have intended the legacy to be payable at the end of the year.

*Decedents' estates—Annuities.*

The gift of an annuity, or annual sum, commences to run at the death of the testator, and this rule is not affected by the fact that the executors were directed by the will to invest the principal of the legacy under the direction of the orphans' court, and that they failed to do so.

Argued June 5, 1895. Appeal, No. 49, July T., 1895, by the President and Fellows of Yale University in New Haven, Conn., from decree of O. C. York Co., distributing estate of Martin S. Eichelberger, deceased. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Exceptions to auditor's report, distributing balance in hands of administrators.   Before BITTINGER, J.

Martin S. Eichelberger died in July, 1893, testate.   Letters of administration, cum testamento annexo, on his estate were granted to Charles S. Weiser and Harry P. Weiser.   On the 9th day of July, 1894, they filed their first account.   No exceptions being filed, it was confirmed, and J. S. Black, Esq., was appointed auditor to distribute the balance thereon.

The only questions raised before the auditor were : (1) Whether claim for extra pay presented by William H. Heininger, decedent's stable man and man of all work, for alleged nursing of decedent should be allowed; (2) whether or not the legatees of specific sums could claim interest from one year after the death of decedent out of the fund for distribution under the circumstances surrounding the administration; (3) whether or not the cestuis que trust of certain funds directed to be invested under the order of the orphans' court of York county, or in securities to be approved by the said court, were entitled to interest on said funds respectively out of this estate, from the date of the death of the decedent.   Heininger claimed for extra work at night, on a contract, and also upon quantum meruit.

The facts and a full synopsis of the testimony, upon which the claim of Heininger was based, appear in the opinion of the Supreme Court.

The auditor refused to find any contract between William H. Heininger and the decedent, and rejected the claim of quantum meruit on the ground that he had been paid in full regularly and promptly with very liberal wages.

The auditor awarded interest upon the legacies from the expiration of one year from the death of the testator, and interest upon the bequests in the nature of annuities from the time of the death of decedent.   The court on exceptions overruled the auditor and found a contract between claimant and decedent, and awarded the claimant $852.50, with interest from decedent's death, and confirmed the balance of the auditor's report.

*Errors assigned* were in dismissing appellant's exceptions to the auditor's report and in sustaining the exceptions of William H. Heininger.

*E. Chapin*, for appellant.—Under the circumstances surrounding this administration the special legacies did not carry interest from one year from testator's death : Anderson's App., 36 Pa. 476 ; Phillips's Estate, 133 Pa. 437.

The fund for distribution is not liable to either of these cestuis que trust for interest: Worrell's App., 23 Pa. 48 ; Worrell's App., 9 Pa. 508 ; Middleswarth v. Blackmore, 74 Pa. 418 ; Schott's Est., 78 Pa. 40 ; Reck's App., 78 Pa. 432 ; Townsend's App., 106 Pa. 268.

An auditor's finding of fact is equivalent to the finding of fact by a jury, and they should always stand, unless there is manifest error or clear mistake : Coulston's Est., 161 Pa. 154 ; McConnell's App., 97 Pa. 35 ; Webb v. Lees, 149 Pa. 17.

Loose declarations of the decedent, and expressions of intention to do something, which were never executed, are clearly not evidence of a contract between claimant and the decedent : Graham v. Graham, 34 Pa. 480 ; Pollock v. Ray, 85 Pa. 428 ; Miller's Est., 136 Pa. 239 ; Coulston's Est., 161 Pa. 151 ; Carpenter v. Hays, 153 Pa. 432 ; Beale v. Kirk, 84 Pa. 415 ; Reed v. Reed, 46 Pa. 239 ; Ulrich v. Arnold, 120 Pa. 170.

*N. M. Wanner, Stewart, Niles & Neff, Horace Keesey, D. K. Trimmer, R. F. Gibson* and *A. N. Green* with him, for appellees.—The legatees were entitled to interest on their legacies from one year after the testator's death : Koon's App., 113 Pa. 621 ; Phillips's Est., 133 Pa. 436 ; Wood v. Penoyre, 13 Ves. 326 ; Huston's App., 9 Watts, 477.

The legatees who take interest on a fund for life, i. e., an annuity (with remainder over to others after their death) are entitled to their interest on said principal sums from the death of the testator : Eyre v. Golding, 5 Binney, 472 ; Hilyard's Est., 5 W. & S. 30 ; Flickwir's Estate, 136 Pa. 374 ; Yost's Estate, 134 Pa. 427 ; Cooper v. Scott, 62 Pa. 139 ; Laporte v. Bishop, 23 Pa. 152 ; Bitzer v. Hahn, 14 S. & R. 232 ; Seibert's Appeal, 19 Pa. 55 ; Jones's Appeal, 3 Grant, 169 ; 13 Am. & Eng. Ency. of Law, 159 ; McDaniel's Appeal, 12 Atl. Rep. 154.

A perusal of the testimony shows conclusively that a contract relation existed between Wm. Heininger and the testator : Thompson v. Stevens, 51 Pa. 216 ; Roberts v. Smith, 1 Yeates, 209 ; Snyder v. Castor, 4 Yeates, 353 ; Smith v. Miligan, 43

Pa. 107; Gerz v. Demarre, 162 Pa. 530; Gordner v. Heffley, 49 Pa. 167; Neal v. Neal, 59 Pa. 350; Perkins v. Hasbrouck, 155 Pa. 494; Miller's Appeal, 100 Pa. 572; Harrington v. Hickman, 148 Pa. 401; Carpenter v. Hays, 153 Pa. 432–436; Coulson's Est., 161 Pa. 151; McConnell's App., 97 Pa. 31; Houck v. Houck, 99 Pa. 554.

OPINION BY MR. JUSTICE GREEN, July 18, 1895.

As to the claim of Heininger, it is very clearly shown in the opinion of the learned court below that it was founded upon an express contract relation.   While the precise rate of compensation was not fixed, there was plenty of testimony to the effect that Heininger was employed specially by the deceased to perform the night service, and that he was to be paid for it in addition to the compensation he received for his day service. It will not be necessary to quote the whole of the evidence on this subject, but the testimony of one of the witnesses is so directly and forcibly in point, that it will be sufficient to make a moderate citation from it.   G. A. Woltman, a disinterested and entirely unimpeached witness, testified as follows, " In the winter or spring of 1891 he (Mr. Eichelberger) was ailing on different occasions and spoke to me in regard to having some one to sit up with him and stay with him at night.   And he thought he would have to get—He wanted William Heininger to stay with him at night and he would get some one in his place for the day work.   I spoke to William about it, and he said he would do the extra work—fill the extra man's place if he would get the pay of the extra man.   I told Mr. Eichelberger that.   He said he was willing to pay William for that if he could do it, and stand it.   He said he would try William; if he could hold out he would sooner for him to do it than to have other ones around the house.   I told William the conversation and William was present one evening, or one day, and William agreed to stay with him at night and do the work in the day time, and was to be paid for the night service."

Here are all the elements of a special contract for the night service.   The deceased wanted this particular person to perform the night service but was afraid he could not do it in addition to his day service.   This being communicated to William he was willing to do it provided he would get the pay of the extra

man. This being told to the deceased he said he was willing to pay William for that if he could do it, and stand it. Then William being present on one occasion, agreed to stay with the deceased at night and do the work in the daytime, and he was to be paid for the night service. We perceive nothing wanting to make out a contract between these parties directly. Then the witness continuing said, "He (William) continued until the winter or spring of 1892, and was getting very tired of it and talked of leaving it altogether. Mr. Eichelberger told me William talked about going, and was very much worried about it, and I told him I would see William and try to get him to stay. He said I should do so. He then said that he would pay him for these extra night services; that he hadn't done it; but he should continue on and he would pay him, would give him it all at one time, would do him and his family more good. I told Mr. Heininger the conversation, and under these conditions he continued on until his death."

Here again there was not only a distinct promise to pay for these extra night services, but an express declaration that he had not as yet paid for them, but that he intended to pay him all at one time as it would do William and his family more good.

This is not the kind of testimony that is fairly subject to the criticism of being only loose declarations made to strangers in occasional utterances, and which are so liable to be misunderstood and often misrepresented. But they were distinct statements made when the very subject was called to the attention of the deceased, and for the purpose of meeting and deciding the particular matter in hand. The witness was directed by the deceased to see William and induce him to stay and continue to perform the night service, and the inducement was the express declaration, which was to be communicated to William, that he should be paid for the extra night service, and should be paid all at one time so as to do him and his family the most good. In addition to this was the entirely undisputed fact proved by all the witnesses, that William really did remain with the deceased at night and waited upon him and performed all the services which his condition demanded. It is further to be considered that such service is of a most important and essential character to persons in such condition; and that it is a

severe and exhausting strain upon the person who performs it, most especially when that person also works during the day. And it does not at all follow that there is to be any implication of gratuitous service of this kind as there is when the service is rendered by a child to a parent. This claimant was a servant in the employ of the deceased and had been for a number of years, and it is only a question of additional and severe service for which he certainly should be adequately paid. There was an abundance of other supporting testimony in the same direction, which it is unnecessary to discuss in detail. It is sufficient to say that we are entirely satisfied with the ruling of the learned court below upon this branch of the case.

As to the payment of interest on the pecuniary legacies from the end of one year after the testator's death, the general rule to that effect is not disputed. But it is thought and contended that there are exceptional circumstances in this case which take it out of the operation of the rule. The only circumstance relied upon in this connection is the fact that a report was in circulation that some female, who was named, claimed that she was married to the deceased and, therefore, it is argued, prudence required that the accountants should wait until after the audit before paying the legacies, and because that was a reasonable ground of delay the legacies should not bear interest from the usual time. We are quite unable to see the force of this contention. The 51st section of the act of Feb. 24, 1834, directs that where no other time is fixed for the payment of legacies they shall be deemed to be due and payable at the end of one year from the testator's death. Under all the authorities interest on legacies commences to run from the end of the year. In Koon's and Wright's Appeal, 113 Pa. 621, we held that interest upon a legacy begins to run from the time it becomes payable, and that where no time for payment is fixed by the will the direction of the act of 1834 must prevail, unless there be language or circumstances apparent upon the face of the will showing that the testator could not have intended the legacy to be payable at the end of the year. We there said, quoting from Huston's Appeal, 9 Watts, 472, " The general rule of giving interest to the legatee from the expiration of the year is not to be extended or controverted upon slight inferences of intention, nor will it yield to the impossibility of getting in the

estate so as to pay the legacy within the year allotted for that purpose. And even though the legacy is to come out of part of the testator's estate which cannot be recovered for a long time after the year, and the testator directs the legacy to be paid when the money which constitutes it can be recovered, still the payment of the interest, if practicable, or at least the computation of it, will commence from the end of the year after the testator's decease."

After such a ruling as this, it is not necessary to discuss the question as to the effect of the mere suggestion that there was a rumor of a possible widow and a claim by her, in postponing the period when interest commenced to run. There is nothing on the face of the will in this case to change the time; there was an ample amount of money and securities on hand with which to pay legacies, and the story about the possible widow was nothing but a rumor. We discover nothing on the record that can suffice in any point of view to change the ordinary rule as to the time when the interest commenced to run on these legacies.

Nor is the contention as to the annual incomes to be paid to John Eichelberger, Eliza Peiffer and Julia Hartman, in any better condition. Almost the whole of the fund consisted of good interest bearing securities, and the interest actually received upon these was more than sufficient to pay the annuities to these several legatees. While it is true that the will directed the executors to invest the various principal sums of these legacies under the direction of the orphans' court of York county, their omission to do so cannot deprive the annuitants of the benefit of the well established rule that the gift of an annuity, or annual sum, commences to run at the death of the testator. This rule is thoroughly discussed and applied in Flickwir's Estate, 136 Pa. 374. It was succinctly and forcibly stated by Chief Justice TILGHMAN in Eyre v. Golding, 5 Binn. 472, thus, " The first payment of the annuity must be made at the end of the first year, or the intention of the testator is not complied with. You must count the time immediately from his death or the legatee will not receive the annuity annually during her life."

In Spangler's Estate, 9 W. & S. 135, GIBSON, C. J., said, " Where the corpus of the legacy is interest accruing on a residue after payment of debts, and not the residue itself, it is well set-

tled that unless a contrary intent is collectible from the tenor of the will, the legatee is entitled to all that is made from the death of the testator." If this is true as to the residue of the estate which cannot be determined in any event until some time after the death of the testator, how much more true it must be where the interest of a designated principal sum is given, which is already in existence and immediately available at the moment of the testator's death. There is nothing apparent on the face of the will indicating a contrary intent of the testator. The direction to invest the money under the supervision of the orphans' court has nothing to do with the case on the question of postponing the time when the annuity commences. If it had the executors would be able to frustrate the will of the testator by simply delaying the time of their application to the court. But in this case there is no possible reason for postponing the commencement of the annuities, because the investments were already made by the testator and bore interest continually from the day of his death. The question is too plain for argument. The case of Phillip's Estate, 133 Pa. 426, has no application, as there the bequests were to be paid to the trustees without interest, and the decision of this court was put directly upon that ground.

The assignments of error are all dismissed.

Decree affirmed and appeal dismissed at the cost of the appellant.

MITCHELL, J., dissents from so much of this opinion as relates to the claim of W. H. Heininger.