## Davidowitz et al. *v.* Philadelphia County et al.

Argued October 7, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Harold D. Saylor,* for plaintiff.

*William T. Connor,* for defendants.

*Grover C. Ladner,* Deputy Attorney General, with him *Charles J. Margiotti,* Attorney General, for Secretary of Commonwealth, intervenor.

*Charles Alvin Jones,* County Solicitor, for Commissioners of Allegheny County, intervenors.

OPINION BY MR. CHIEF JUSTICE KEPHART, October 12, 1936:

This proceeding on original jurisdiction challenges the use of voting machines in the coming election. These machines expedite the count, are helpful in reducing the possibility of election frauds, and their employment should be encouraged. They have been installed in the various counties at great expense and by vote of a majority of the electors thereof. A court, therefore, should not restrain their use unless a legislative or constitutional provision is clearly violated. However, the legislature evidently foresaw that contingencies might arise where voting machines could not be used, for it provided that ". . . at any election, [where] the number of candidates nominated . . . for any office renders the use of voting machines for such office at such election impractical, or if, for any other reason, at any election the use of voting machines is not possible or practicable, the county commissioners may arrange to have the voting for such or all candidates or offices conducted by paper ballots." Act of April 18, 1929, P. L. 549, sec. 21, as amended by Act of June 23, 1931, P. L. 1185, sec. 17.

Plaintiff is the nominee for the state office of Auditor General as candidate of the "Old Age Pension Party." Defendants, commissioners of Philadelphia County, propose to use voting machines in 40 [the county has voting machines for that many wards but no more] of the 50 wards in that county. The plaintiff avers that in some of the 40 wards there are as many as 21 political appellations entitled to appear on the voting machine, and in all of the 40 wards there are more party appellations entitled to appear than can be accommodated in a column either at the side or the top of the machine.[1] As a result

---

[1] There are different types of machines in use in the various counties throughout the state. On one there are ranged in blocks

he avers the county commissioners propose to omit the appellation "Old Age Pension Party" from the top or along the side of the machine where it would appear in conjunction with the appellations of other parties and groups as a guide to the voter wishing to support that party's candidates, leaving as the only guide to the location of his political body the appellation affixed to the candidate's label in the body of the machine. Plaintiff contends this arrangement is illegal, and by reason thereof the voters will not be able to find this political organization and hence his name as their candidate, that he will thus lose votes and suffer irreparable injury. He states that in all the wards of Philadelphia County it will be necessary to have paper ballots for a referenda to change the purposes of a bond issue and that, as a consequence, extra expense will be incurred and congestion in the election booths must result from the use of both paper ballots and voting machines. He prays that an injunction issue restraining the commissioners of Philadelphia County from using voting machines in any of the wards, and such further relief as this court may deem proper. Pre-emptors of the United Labor Party, Social Justice Party, National Union Party, and

---

in a vertical column on the left-hand side the names of the various political organizations. Each of these blocks containing a political appellation has a lever, whose registration enables a straight party vote for all candidates of that group. Horizontally across the top of the machine appear the names of the various offices to be voted upon and beneath the title of the office the names of the candidates of the various political groups on the same horizontal row with their party appellation as registered on the outside left-hand column. Each of the blocks containing the candidate's name also has imprinted thereon the party appellation of the candidate, and by virtue of levers adjoining each of the candidate's squares, it is possible to register separate votes for each office to be voted upon. Another type of machine has blocks containing the political appellations in a horizontal column across the top of the machine and the offices to be voted upon in a vertical column on the left-hand side of the machine.

Royal Oak Party, have intervened and are joined as parties plaintiff in this action.

The commissioners of Philadelphia County, in answering the complaint, neither admit nor deny the averments in the bill relating to the number of parties entitled to appear on the voting machines because, it is stated, they have received no certificate from the Secretary of the Commonwealth designating the form of the ballot, although they assert a belief that there will be more political groups than can be accommodated. The commissioners of Allegheny County intervened as defendants on the ground that they plan to use voting machines in the coming election and that our decision may affect their use because of the position in the machines given to plaintiff's party.

The Secretary of the Commonwealth, through the Attorney General, intervened and opposed the application for an injunction. While he admits that there are more political parties and bodies than the number of spaces provided by the voting machines in the column for political appellations, he asserts that the highest number of political organizations entitled to have their name appear on the machine is eighteen, and that of these nine are spurious political bodies having no distinct principles. He denies the right of plaintiff's party to have its name appear on the ballot on a label in a separate column as do those of the other parties, asserting that the law vests in him discretion to arrange the ballot labels for the voting machine "as nearly as may be" in accordance with the provisions of the laws prescribing the form and arrangement of paper ballots. Counsel for the Secretary have submitted to this court a sample form of a proposed arrangement of the ballot labels. They have placed on the two lower horizontal columns in the body of the machine the party appellations of ten political bodies, nine of which it is maintained are fake organizations. Plaintiff's is among those in this grouping; its name does not appear on the side nor on the top of a

machine along with the political appellations of other groups which do so appear. The horizontal rows lack the uniformity preserved in the upper rows and the only indication as to where these particular political organizations and their candidate can be found is through consultation of the individual candidate blocks.

Because of the allegations in the bill and answers, it will be necessary to discuss matters leading up to the real question involved. The statute which regulates the nomination of candidates, or so much of it as must be considered here, is the Act of June 10, 1893, P. L. 419; it provides for three methods of nomination. The first, by the old system of convention or caucus; the second, by the filing of nomination papers by an individual; and the third, by the pre-emption of a party name by five electors through affidavits filed in the prothonotary's office together with nomination papers for candidates for such pre-empted party. The first method was superseded by the primary election law of 1913; the second and third methods still remain. Under the 14th section of the Act of June 10, 1893, as amended, regulating the form of the official paper ballot, it is provided that ". . . there shall be printed on the extreme left of the ballot . . . a list of the names of all political parties or groups of nominees . . . presenting candidates to be voted for at such election" to be arranged in the order of votes obtained at the last presidential election, beginning with the party receiving the highest number of votes. Following these "shall be the names of the parties or principles not presented on the ballot at the last presidential election, arranged alphabetically, according to the party name or political appellation." The manifest purpose of the legislature was to enable the voter to quickly locate his political group and its candidates. Under this provision, where paper ballots were or are now being used, all political organizations, regardless of their method of nomination, had or have an appropriate place on the left-hand side of the ballot.

Plaintiff grounds his claim on this section and Section 7(b) of the Act of April 18, 1929, P. L. 549, set forth below. The Primary Act of July 12, 1913, P. L. 719, with its amendments, does not purport to delimit political organizations to those participating in the primaries; it leaves undisturbed the right to nominate in accordance with pre-existing legislation relating to pre-emption and accords to such bodies the right to have a place on the official ballot. This was the state of the law up to 1929 when the Voting Machine Act was passed pursuant to constitutional authority.

The Act of April 18, 1929, P. L. 549 [Voting Machine Act] does not abolish nomination of candidates by nomination papers following a pre-emption. Section 10(g) provides as follows: "The form and arrangement of ballot-labels,[2] to be used at any election, shall be determined by the Secretary of the Commonwealth, *as nearly as may be in accordance with the provisions of the laws prescribing the form and arrangement of ballots at such election*, and shall be furnished by him to the county commissioners." This section directs our immediate attention to the *preceding* ballot act. In further support of his bill and as affecting the proposed arrangement of the ballot labels, plaintiff's counsel relies on Section 7(b), of the Act of 1929, as amended, which provides: "It shall permit each voter, at other than primary elections, to vote a straight party ticket in one operation, and, in one operation, to vote for all the candidates of one party for presidential electors, and, in one operation, to vote for all the candidates of one party for every office to be voted for except those offices as to which he votes for individual candidates." Under the Voting Machine Act plaintiff claims a right to a place for his political appellation on the side or top column of the machine and also

---

[2] "Ballot-labels" are defined in the Act (sec. 1) as the "cards, labels or other material, containing the names of offices and candidates and statements of questions to be voted on" which are to be affixed to the face of the voting machine.

that the arrangement of the ballot labels on the machine permit a straight ticket vote for his political group by one operation.

The Secretary, through his counsel, contends that his discretion to arrange the ballot labels on voting machines empowers him to disregard the provisions of the Ballot Act of June 10, 1893, and its amendments, and to place plaintiff's political appellation on the machine with no other indication to it than that found in the body of the machine beside plaintiff's name as a candidate for office. If this discretion exists it is apparent it could be exercised whether or not the voting machines are large enough to accommodate all political organizations and that his arrangement of the ballot labels would be unregulated, applying alike to any and all parties or political groups. Under such an interpretation he could take a major party, scatter its candidates for offices in various lines, force a lever to be thrown for each candidate, producing such inconvenience and confusion as to practically disfranchise many thousands of voters. If the words "as nearly as may be" authorize such unlimited discretion as is here urged, what is the "impractical" operation of the machine mentioned in Section 21 of the Act and what becomes of the mandatory provisions that apparently were not to be violated? If his discretion is limited, where is the line to be drawn?

Under the Ballot Act of 1893 *a political organization which obtains its name through pre-emption methods has a right to have that name appear on the first column of the ballot whether they nominate for all offices or not.* The law gives this place not merely to parties in a restricted sense having a place in the primaries, but to those having political appellations and making nominations by pre-emption: See the exhaustive opinion of Attorney General Carson in re Political Parties, 13 Dist. Reports 295. The Voting Machine Act says that the arrangement by the Secretary shall be "as nearly as may be in accordance with the . . . laws prescribing the

. . . arrangement of ballots *at such election."* The ballot law has many rules regulating the form of paper ballots. It would be impossible to adapt all these regulations to voting machines; there are certain features which can be incorporated into them and others which cannot. With respect to listing party appellations on the left of the machine, this provision is mandatory and must be complied with. The law reads the arrangement of the voting machine shall be as near as may be to the paper ballot *"at such election."* This relates to the face of the paper ballot used at the same election. All counties do not use voting machines and some use both paper ballots and voting machines. The listing of the party names on the left or top of the machine must correspond so far as possible to that on the paper ballots. It is within the power of the Secretary to adjust any small differences as he, in his judgment, deems proper,[3] but this does not extend to a total disregard of the mandatory provisions of an act which requires all party names or political appellations represented in a given district to be placed on the left-hand column or the top. The Secretary is not permitted to substitute his discretion in this regard for that which the legislature has there definitely commanded. To say that the legislature by this section intended to vest in the Secretary of the Commonwealth an uncontrolled regulation of the arrangement of the ballot labels would cause the act to run afoul of the principle which forbids delegation of legislative power: *H. D. O'Neil v. Am. Fire Ins. Co.,* 166 Pa. 72; *Pittsburgh's Petition,* 138 Pa. 401, 431.

The policy of the law is to give to each voter a right of suffrage subject to no undue hindrance or burden not imposed on every other voter. The constitutional objections to lodging such unlimited discriminatory powers in an officer of the state enabling him to place one political group in a position where it is at a total dis-

---

[3] For illustration, see Note 4, page 28.

advantage compared to other groups so far as accessibility and visibility are concerned, in themselves raise insuperable difficulties to the possibility that such powers can exist. In *La Guardia v. Cohen,* 266 N. Y. S. 739, where a somewhat similar problem arose, the court stated: "It is the spirit of a free electoral system that there shall be no disenfranchisement of duly qualified voters. Constitutional principle as well as the American spirit of fair play dictate that the same consideration should be accorded to voters who desire *to support the independent ticket as to voters of regular party tickets;* that one voter shall have the opportunity to distinguish labels and emblems on terms of absolute parity, as far as physically possible, with every other man who seeks to cast his ballot." See also *Crane v. Voorhis,* 178 N. E. 169; *Callaghan v. Voorhis,* 168 N. E. 447. In this state we have said: "Elections are free and equal . . . when the regulation of the right to exercise the [elective] franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no contsitutional right of the qualified elector is subverted or denied to him." *Winston v. Moore,* 224 Pa. 447, 457.

The action of the Secretary, unless other reasons appear to sustain it, clearly nullifies that portion of the ballot law which commands him to place underneath the names of the regular parties the names of all other political organizations. The language of Section 10 (g) of the Act of 1929 is mandatory, and when such regulations are adopted by the legislature, we have repeatedly held, they must be abided by: *Stem v. Bethlehem Boro.,* 231 Pa. 461; *McLaughlin v. Summit Hill Boro.,* 224 Pa. 425; and see *In re Multer,* 282 N. Y. S. 757, 761. Where the legislature has regulated the form of a ballot, it does not lie within the power of any officer to change that form. As the act specifically states that the Secretary of the Commonwealth shall conform "as nearly as possible" to the ballot law, it was designed to secure to all political

parties and bodies, the candidates thereof and the voters therefor, the equality of treatment which our constitution wisely provides shall safeguard elections, and which the legislature provided for by the Act of 1893. The Secretary must comply with the ballot law by putting all accredited political parties by party names and other political groups by political appellations on the first left-hand row or top row.[4] The proposed arrangements by the Secretary submitted to us show in order the following parties: Republican, Democratic, Socialist, Prohibition, Communist, Industrialist, Labor, Royal Oak.[5] He has wisely provided for a full parallel row with the use of a straight party lever for those parties having electors for presidential candidates. This arrangement would well be within his power under the words "as nearly as possible." This leaves some ten political bodies, none of which have presidential candidates and only one of which a candidate for a state executive office, for the two remaining blocks for party names. To carry forward the beneficent purposes of the Ballot Act and preserve the voting machine for use, the difficulties of placing all political appellations on the front row must be obviated, if possible. This can be accomplished but not in the submitted arrangement of the Secretary. The names of the ten remaining political organizations can be printed in type sufficiently large as to be clearly and quickly read, and be placed one under the other in these two blocks and, following the name of the political group, in the same print, there should appear the specific number and letter of the ballot label where their candi-

[4] As Section 10(d) makes permissible the arrangement of the title of the offices to be voted upon either vertically or horizontally, it necessarily implies a variation from the ballot law rule requiring the party appellations at the left, to permit them to be consecutively ranged across the top of the machine.

[5] In addition to those above named, in Allegheny County, there is an Independent Party which nominated at the primary election. This may change the order of the names above indicated in that county.

dates for office may be found.[6]  To enable this to be done, the straight party lever on these two blocks must be removed; this may be readily done.  The following diagram—not conclusive—is shown to illustrate our thought.[7]  Of course, where the number of parties are such as to make this arrangement impractical, there is nothing to do but use paper ballots.  However, at the argument, we were given to understand that only 18 parties had filed in the district for which the proposed arrangement is made and that would be the largest of any district in the state.  When the Secretary of the Commonwealth has conformed to these instructions, he will have carried out the duties of his office in compliance with the law.  His full obligation ends when he certifies this form and arrangement of the ballot labels to the county commissioners; they must then exercise their own discretion as to whether or not, with the certification before them, the use of voting machines is impractical.  It is their discretion alone that must govern.  Only when bad faith, abuse of discretion, fraud or violation of the law appears, may courts intervene.  The burden of responsibility rests solely on the county commissioners.[8]

---

[6] Section 10(b) provides for numbers and letters to designate office candidates and where found.

[7]

|  | See Levers (or Buttons) |
|---|---|
| American | 4 H.  8 H. 12 H. 13 H. |
| Citizens Union | 9 H. |
| Communist Townsend | 5 H. |
| National Union | 6 H. 10 H. 14 H. 16 H. |
| Social Justice | 7 H. 11 H. 15 H. 18 H. |
| Old Age Pension | 3 I. |
| Townsend Plan | 6 I. 10 I. 14 I. 17 I. |
| Union | 7 I. 11 I. 15 I. 18 I. |
| United Labor | 17 H. 4 I.  8 I. 12 I. |
| Victory | 5 I.  9 I. 13 I. 16 I. |

[8] The Act reads: Section 21. Voting by Ballot: "If a method of election for any candidates or offices is prescribed by law, in which the use of voting machines is not possible or practicable, or

While our construction of the Act for the guidance of the Secretary renders impossible the use of separate and distinct parallel columns of candidates for each political organization, when comparison is made of Section 2(j) of the amending Act of May 7, 1935, P. L. 131, with its wording before amendment (Section 7(j) of the Act of April 18, 1929, P. L. 549), it appears that the legislature has restricted the necessity of separate parallel rows for assignment to the candidates of each group from "any election" to "any primary election." It is thus evident that the legislature contemplated the placing of candidates of different political groups on a single row as is here indicated, and did not intend to make the use of machines impossible because of the number of political appellations to be placed on the machine opposite a single row.

This legislative action also answers, in part, the second contention of plaintiff that there must be capable of use a single lever to vote for all candidates of each political group, including his own. Section 7(b) of the Voting Machine Act, as amended, provides: "It [the machine] shall permit each voter, at other than primary elections, to vote a straight party ticket in one operation, and, in one operation, to vote for all the candidates of one party for presidential electors, and, in one operation, to vote for all the candidates of one party for every office to be voted for except those offices as to which he votes for individual candidates." The mechanism for this would necessitate that all candidates of a particular group should appear alone on a particular row. As the legislature has clearly indicated that a single parallel row for all candidates of a political group is not necessary, it follows that it cannot have in-

in case, at any election the number of candidates nominated or seeking nomination for any office renders the use of voting machines for such office at such election impracticable, the county commissioners may arrange to have the voting for such candidates or offices conducted by paper ballots."

tended to confer a straight party lever for all groups.

A careful reconciliation of Section 7(b) with 7(c) re-enforces the conclusion that the Act does not contemplate that all political organizations shall be afforded the facility of a straight party vote lever where a machine is overloaded, although its grant, where possible, is not, of course, in violation of the law. It is to be noted that Section 7(b), in making a feature of the machine the single lever registering a vote for all candidates of a political organization, refers throughout to a political "party." A "political party" is defined and recognized by Section 2 of the Act of July 12, 1913, P. L. 719. The "political party" has often been distinguished by our courts from "political bodies" who nominate by nomination papers under a pre-emption: See re Political Parties, supra; Steer v. Martin, 7 D. R. 644; cf. Town Meeting Nomination Paper, 259 Pa. 231; see Section 3 of the Act of June 10, 1893, P. L. 419, as amended by the Act of July 9, 1919, P. L. 855. While Section 7(b) speaks only of a "party" vote, Section 7(c) states that the machine shall be so set up as to permit the voter to vote a ticket selected from the nominees, of "any and all parties, from independent nominations, and from persons not in nomination." The deliberate restriction in Section 7(b) to a "party" vote and the inclusion in Section 7(c) of "independent" nominations, combined with the fact, pointed out above, that candidates of different groups may be interspersed on one row, can lead only to the conclusion that the legislature intended the single lever to be available to record a straight vote only for the candidates of the regularly constituted "political parties" and not to extend to those "political bodies" arising by pre-emption where the machine cannot accommodate them. Such legislation must govern as the intent is clear unless it violates some constitutional provision. While it cannot be doubted that the voter for the candidates of an independent body will be forced to expend a little more effort in registering his vote than

will the voter for a political party's candidates, this inconvenience is not so great as to condemn the entire use of the voting machine or cause the entire Act to be declared unconstitutional, nor does it constitute an invasion of the voter's constitutional right. The name of his political body on the ballot label on the side or top of the machine will show the voter where to look and to what blocks he must look; in this respect it is more specific than the label for the regular parties. The inequality is one of degree. We will not condemn the Act simply because the members of political bodies, who have not the status of parties, must work a trifle more than the members of a party. We point out, in passing, that in no case will these voters for independent nominations be forced to depress more than four levers and in some instances only one.

It is urged that many of the political bodies filing papers under pre-emption are fictitious, spurious or "fake" parties or merely nuisance nominations, and further, that we should strike from these lists those political appellations which represent bodies having the same candidates for different legislative offices. In a proceeding such as this, we are not at liberty to declare this or that group guilty of a vicious motive; we have no facts on which to base a conclusion. We must treat all as on an equal basis, one as invulnerable as the other. To hold otherwise might result in great harm, for in any one of these political groups may lurk the seeds of a party which may ultimately rule the nation through the election of its candidates.

Having indicated the law that should govern and there being nothing before us on which to grant the prayer for relief,

The petition is dismissed.

Mr. Justice DREW dissents.