## O'Neil v. Lawrence, Secretary of the Commonwealth, et al.

442

*Lemuel B. Schofield, Homer L. Kreider,* and *Walter H. Compton,* for plaintiff.

*Earl V. Compton,* for defendants.

HARGEST, P. J., and SHEELEY, P. J., fifty-first judicial district, specially presiding, October 20, 1936.—Plaintiff, as a taxpayer and an elector of the City of Philadelphia, filed this bill of complaint on October 8, 1936, asking for a preliminary injunction. A rule was granted, returnable October 13th, to show cause why such injunction should not issue. The bill is brought against David L. Lawrence, Secretary of the Commonwealth, Marshall H. Morgan, averred to be counsel for the Republican City Committee of Philadelphia, Charles H. Hagen, averred to be an employe of the Republican City Committee, and 53 candidates for the offices of State senators, representatives in Congress and representatives in the General Assembly of Pennsylvania from various Philadelphia districts.

The bill, in paragraphs 1 to 8, inclusive, avers that the City of Philadelphia has adopted voting machines at an approximate expenditure of $2,500,000, which are restricted to nine places for straight party voting, and which have heretofore been ample for that purpose; that under the Ballot Act of June 10, 1893, P. L. 419, and its supplements and amendments, a method is provided "whereby bona fide new political parties may be formed"; but that the principal purpose of the act was to afford a means for "members of genuine newly organized political bodies to place candidates in nomination for election and not to enable existing parties or their candidates already on the ballot to promote their political interests by duplicating nominations for offices"; and that defendants, other than the Secretary of the Commonwealth, "combined and conspired together for the purposes hereinafter more particularly set forth, unlawfully, falsely and fraudulently to multiply nominations, and to that end participated in fraudulently preëmpting the names of five or more political combinations or political bodies, which were in fact nonexistent and represented no policy or body whatsoever and were organized solely to defeat the plain intent of the election laws and to interfere with elections, as hereinafter set forth." Then follows paragraphs 9 to 160, inclusive. Each one of these paragraphs relates to one or more of the 53 candidates alleged to have conspired with defendants Morgan and Hagen and the persons who preëmpted a political party appellation.

Section 9, illustrative of all the other sections, is as follows:

"In furtherance of their unlawful combination and conspiracy, the defendants, other than David L. Lawrence, and more particularly Joseph C. Trainer, Republican candidate for State senator, Marshall H. Morgan and Charles W. Hagen, procured Jeanne VanHorn, Maria Mirto, Nellie Gaskins, Robert Jones and Joseph Martino, falsely pretending to be a part of a political body known as 'Social Justice Party' (when in fact no such party or

body existed) to file a preëmption affidavit in the prothonotary's office of Dauphin County, setting forth that they were members of a body and policy known as 'Social Justice Party,' when in truth and fact they were at the time, and still are, members of the Republican Party, and thereafter to circulate, have signed and file nomination papers putting in nomination the said Joseph C. Trainer as a candidate for State senator for the First Senatorial District (Philadelphia) of the alleged or pretended 'Social Justice Party'. Said nomination papers were signed principally by members of the Republican Party, and deposited by Marshall H. Morgan, who was at the time, and still is, counsel for the Republican City Committee of Philadelphia, and Charles W. Hagen, who was at the time, and still is, an employe of the said Republican City Committee."

Sections 10, 11, 12, and 13, purporting to nominate Joseph C. Trainer, are identical with section 9, except that in each section there are five different preëmptors, and the party appellations attacked are respectively "Farm Labor Party", "United Labor Party", "Townsend Plan Party'" and "National Union Party". In the bill there is also another party known as the "Union Party".

Sections 9 to 160, inclusive, contain various averments of conspiracy between Morgan, Hagen, and the several candidates in the several separate party nominations with the various preëmptors, perhaps aggregating one hundred persons. Following that, the bill alleges that the preemption affidavits were prepared and filed at one time by Marshall H. Morgan, assisted by Charles W. Hagen, who were acting "for the benefit, at the direction and solely in the interest of the Republican Party in Philadelphia, its officers, members, and candidates"; that the nomination papers, as well as the vouchers to those signing, were signed by members of the Republican Party who were not and never had been members of the political body or policy as pretended in the preëmption affidavits, and that they

had no right to sign such nomination papers; that "their signatures as members of said alleged political bodies were and are false and fraudulent and give no validity to said political papers as lawful nomination papers of said political bodies"; that the various political bodies represent no policy, and their nominees are without exception candidates of the Republican Party, and that the deliberate purpose and effect of the conspiracy averred was to prevent the use of voting machines by adding spurious, phantom, or fraudulent political parties to others that have been formed in good faith, by overcrowding the machines and making their use impossible; that the taxpayers of Philadelphia will be put to an expense of $350,000 if paper ballots and voting booths are required to be used; that the effect of this alleged conspiracy is that the Republican Party of Philadelphia, instead of having three watchers as allowed by law at each polling place, will secure from 15 to 21 watchers, and that the Republican Party will thereby be able to distribute from $180 to $240 in each election division in the 27 districts referred to; that the nomination papers are fraudulent on their face because they show that many of the signatures are in the same handwriting; that there is a number of duplications of signers who had signed nomination papers of the same candidate on other spurious nominations, and that because of the great mass of nomination papers thus filed it was impossible to examine and check the names in all of the districts to determine the real party affiliations until just before the date of the filing of this bill.

The bill prays that the following parties, "Social Justice", "National Union", "United Labor", "Townsend Plan", "Farm Labor", and "Union", be declared to be false and fraudulent political parties without lawful or factual existence and not entitled to a place either upon voting machines or paper ballots to be used at the coming election.

The Secretary of the Commonwealth filed an answer.

446

All the defendants, except the Secretary of the Commonwealth and three others, filed preliminary objections to the bill.

It is apparent that whatever is proper to aver in preliminary objections to a bill of complaint would be proper to urge as reasons why a preliminary injunction should not issue, and therefore the court, this case being one in which time was very much of the essence of the controversy, considered the preliminary objections. They raise the following questions: (1) That plaintiff has an adequate remedy at law; (2) that the suit is an endeavor to attack collaterally the validity of nomination papers after the time for objections has passed; (3) that plaintiff is guilty of laches; (4) that the bill contains scandalous, impertinent, and irrelevant matter and is not filed in good faith.

Much was said on the argument as to the distinction drawn by the courts between political parties and political bodies: Commonwealth ex rel. v. Martin, Secy. of Com., 21 Pa. C. C. 422. Chief Justice Kephart discussed this in his opinion filed on October 12, 1936, in the case of Davidowitz v. Philadelphia County, 324 Pa. 17. We think this has no material bearing on the question before us.

Section 3 of the Ballot Law of 1893, P. L. 419, as amended by the Act of July 9, 1919, P. L. 855, 25 PS §972, provides the only machinery for creating a new political body which may subsequently ripen into a political party:

"That if five of the electors composing any political body making a nomination by nomination papers shall file, with the prothonotary of the county in which the nomination paper or papers are to be filed, an affidavit setting forth that they have adopted a certain political appellation to designate their policy, subject to the limitations of this act regarding the selection of names, that thereafter such political body shall have the exclusive right to use the said name or appellation for the election for which such nomination or nominations are made, pro-

vided that a certificate from the prothonotary setting forth such a compliance with the act be filed with the nomination papers filed by such political body".

In passing on the question whether a bill in equity will lie to correct the evils which may arise from the organization of what have been characterized in this case as "phantom", "mushroom" or "upstart" bodies, we are not to be understood as approving in principle wholesale and temporary preëmptions. We do not dissent from the views expressed by Judge Simonton in the case of Crow Anti-Combine Party Nomination Paper, 5 Dist. R. 665, as early as 1896, and Hendley v. Reeder et al., 5 Dist. R. 677, 680, that the duplication on the official ballot of the same persons as candidates may lead to confusion; and the same thought was suggested in the last paragraph of Chief Justice Kephart's opinion above referred to. Judge Stewart, specially presiding in this court, in Commonwealth ex rel. v. Martin, Secy. of Comm., 21 Pa. C. C. 422, said:

"The law was not designed to advance the interests of political combinations, but to secure a safe and convenient ballot, that in its turn would secure an honest and intelligent expression of the popular will."

But elections and election machinery are a matter of statutory regulation, and the courts are bound to carry out the statutes in that respect. We cannot impose our wills as to what would be desirable or even as to what would prevent fraud if the legislature has not so prescribed.

1. The first question is whether plaintiff has a remedy at law. Section 6 of the Ballot Law of 1893, as amended by the Act of July 9, 1919, P. L. 832, 25 PS §976, provides, in part:

"All nomination papers which have been filed shall be deemed to be valid, unless objections thereto are duly made by writing filed in the court of common pleas of the county in which the paper objected to has been filed, and with the officer or officers with whom such papers have been filed, and within the following periods: First. In

the case of papers filed with the Secretary of the Commonwealth, at least fifty days before the day of election. . . . Third. In case the court is in session, one or more judges thereof shall proceed to hear such objections without unnecessary adjournment or delay, and shall give such hearing precedence before any other business before him or them. With respect to papers filed with the Secretary of the Commonwealth, such objections shall be heard and finally determined at least thirty days before the day of the election."

It is not the policy of our law to multiply remedies. Section 13 of the Act of March 21, 1806, 4 Sm. L. 326, 46 PS §156, provides that where a statutory remedy is provided it shall be exclusive and no resort to a common-law remedy may be made: White et al. v. Old York Road Country Club et al., 318 Pa. 346; Taylor v. Moore, 303 Pa. 469. Of course, where there is a statutory remedy equity has no jurisdiction.

In Cassin v. Reeder et al., 5 Dist. R. 681, there was a bill in equity to enjoin the county commissioners from printing the name of Milton W. Kerkerslager on the ballot as a candidate of the McKinley-Citizens' Party. Kerkerslager and William L. Cassin had each been nominated by nomination papers of the same party for representative in the legislature from the same district, and no objection had been filed to either of the nomination papers. But the Secretary of the Commonwealth concluded that inasmuch as Kerkerslager had been nominated at a town mass meeting of the said party he was the rightful nominee. This court said:

"The complainant had a week's time after Mr. Kerkerslager's nomination paper was filed to present his objections to this court. This was an adequate remedy, and having failed to avail himself of it, he is now without redress. The injunction is dissolved and the bill is dismissed at the complainant's costs."

There can be no question that if the matter is one which objections to nomination papers will reach there is no

jurisdiction in equity. The bill, in paragraphs 162 and 167, distinctly avers that the nomination papers have no validity, the signatures are false and fraudulent, the nomination papers show on their face that they are invalid, many of the signatures are in the same handwriting and there are a great number of duplications of signers, in that the nomination papers complained of have been signed by the same persons who had already signed other nomination papers of the same candidate. These are the very questions which this court has been periodically passing upon on objections filed to nomination papers, ever since the Ballot Law was in force.

The further question, however, is whether objections averring other kinds of fraud can be raised. There is no limitation in the statute as to the kind of objections which may be filed in the courts. All that the statute says is that: "All nomination papers . . . shall be deemed to be valid, unless objections thereto are duly made by writing filed in the court".

In In re Smythe, 9 Luz. L. R. Rep. 281, on a petition to declare the nomination invalid, petitioner alleged that there was a question of fraud practiced upon him in the convention. While his objection was not sustained, it was not because such a fraud could not be asserted by objections, but because he had not shown that the alleged fraud was called to the notice of the convention. If nomination papers may be declared false and fraudulent because the same persons signed more than one nomination paper, or for any of the reasons which have repeatedly been declared by this and other courts, what reason can there be to hold that objections are not good merely because the fraud is the outgrowth of a conspiracy? The question of fraud perpetrated by fictitious signatures to nomination papers has been many times raised. If there be no right to have a nomination by a fictitious party, that would be no less a fraud than fictitious signatures. Objections to the papers would reach one as well as the other. Let us assume, for the purpose of argument, that the contention

of plaintiff is sound, namely, that in order to secure a nomination, by a new political body which has acquired the right by preëmption, the papers must be signed by persons who have severed their allegiance to all other political parties, and that if, after such nomination, the signers adhere and reaffirm their allegiance to the political party of which they were formerly members the nomination would be void. It is difficult to conceive why such a situation could not be reached by objections to nomination papers. It follows that if that situation was brought about by a conspiracy to secure an advantage to a particular party the nomination would be no less invalid. Certainly both the fraud which brought it about and the invalidity itself could be reached by objections to nomination papers. Both fraud and conspiracy may be sometimes difficult to prove, but it will be no more difficult to prove on the law side of the court to sustain objections than it would in the equity court for an injunction.

In our opinion, plaintiff, as an elector, could have raised any questions by objections to these nomination papers, presented within the statutory period, which he is now seeking to raise by this bill of complaint, as a taxpayer.

It has been very strenuously argued that the conclusion which we have just expressed is inconsistent with our opinion filed on September 28, 1936, in the case of Fenerty v. Lawrence, Secy. of Com., 27 D. & C. 640, because in that case the effect of the opinion was to declare invalid nomination papers to which no objections had been filed. There is no inconsistency between the position here taken and that case. In that case, five preëmptors secured the exclusive right to nominate a candidate for Congress for the Royal Oak Party. They made the nomination and presented the papers to the Secretary of the Commonwealth. He refused to receive them because he had already received nomination papers purporting to nominate Michael J. Bradley, accompanied by a certificate of a preëmption affidavit which was filed after the affidavit accompanying the Fenerty papers. We held, in a petition

for a mandamus, that it was the legal duty of the Secretary of the Commonwealth to receive and file the Fenerty papers, because those who nominated Fenerty had acquired the exclusive right. It was the duty of the Secretary of the Commonwealth to certify the Fenerty papers. The fact that, as a corollary to this conclusion, the Bradley papers were invalid does not militate in any respect against the position which we now take. Even if Fenerty had filed objections to the Bradley papers and his objections had been sustained, they would not have secured his full rights, as the Secretary of the Commonwealth had refused to receive his papers and no nomination papers were on file for him. In that case the precise question could not have been raised by objections.

2. Counsel for plaintiff admitted on the argument that the motives of electors cannot be legally questioned. But an inspection of this bill shows that the bill does this very thing, that is to say, it proceeds on the theory that the preëmptors had no intention to organize real political bodies when they preëmpted the six names contained in the bill, and that the persons signing the nomination papers had no intention of creating a genuine party when they signed the nomination papers nominating the 53 candidates who are defendants. The epithets used in the bill and on the argument, calling these bodies "fake", "mushroom", "spurious", "phantom" and "fraudulent", are superlatives which may correctly describe an attempt to set up a temporary political body only for the election to be held on November 3, 1936. But the difficulty is that the courts have decided that to secure the exclusive right to make a nomination the preëmption must be filed for each particular election. It may be that the legislature never intended a situation, such as is presented by this bill, where one candidate who has been nominated by a particular political party has secured six other nominations by political bodies which have been started by the filing of preëmption affidavits. In Wakefield's Appeal (No. 1), 229 Pa. 581, 584, it is said:

"This starts the movement with the right to the exclusive use of the name preëmpted and with the nomination of persons desired as candidates. It is the foundation upon which the new party structure rests."

Such a movement may ripen into a new party and be extended from State to local offices. If one such preëmption were made, it could hardly be contended that the preemptors and the persons signing the nomination papers, by the mere fact of returning to the party of which they were previously members, showed an ulterior motive. Would the fact that the preëmption and nomination were secured by an agreement between the candidate of the Republican Party and representatives of the Republican Party machinery amount to such a fraudulent conspiracy as would invalidate the nomination?

Would five or six preëmptions, made by different preemptors and different signers, who may have been separately induced to act, be enough upon which to base a judgment declaring the nominations void on the ground of fraud? Let us suppose, as often happens, that there are 1,000 or more signers to the nomination papers when only 200 are required. Would the papers be declared invalid merely because they were inspired by an agreement between a few persons of which only a very few of the signers knew, and to which none was a party? If the signers have a right to make the nomination, such right certainly could not be taken away by some previous arrangement between other parties of which the signers were not aware, even if it amounted to a conspiracy.

If, as averred in the bill, this multiplication of parties prevents the use of voting machines and greatly increases the cost to Philadelphia County of the election, it is unfortunate, but the courts must deal primarily with rights, not with results. If we have no jurisdiction to hear the case the fact that it imposes a burden cannot sway us.

As we have already said, this is a legislative question. It may be that the legislature never intended such a development as this bill of complaint demonstrates, but the

remedy is with the legislature. The Act of April 29, 1903, P. L. 338, specifically gave to a candidate the right to have more than one nomination: Town Meeting Party Nomination Papers, 259 Pa. 231, 239. The legislature dealt with the subject, insofar as primary elections are concerned, by the Act of June 14, 1935, P. L. 337, which prohibits a candidate, except for the office of judge of a court of record, to be named for the same office by more than one party, but the legislature did not see fit to extend the prohibition to general elections.

There is no allegation in this bill that either the preemptors, about a hundred, named therein, or the multitude of signers to the nomination papers, are guilty of conspiracy. The conspiracy is charged between Morgan, Hagen, and the candidates. It is averred that the preemptions and nomination papers were secured "in furtherance of their unlawful combination and conspiracy."

3. The validity of preemption affidavits is not now material to any controversy. These affidavits were filed for the purpose of securing the exclusive right to the party appellation, but there was a right to use that name without a preemption affidavit: Fowler's Nomination, 27 Dauph. 289; Shipman's Nomination, 34 Dauph. 89.

It has long been held that electors signing nomination papers may be registered voters of another party: Independence Party Nomination, 208 Pa. 108; Tracey's Nomination, 23 Dist. R. 888. The statute gives the right to make nominations by nomination papers without restriction as to whom the signers may be, other than that they should be electors of the district. So there would have to be some other allegation of fraud than that the signers were registered voters of the Republican Party.

4. Defendants contend that plaintiff is barred by laches. There is great force in this contention. Under the statutory provision, hereinbefore quoted, the last day for making nominations is 60 days before the election, and the last day for filing objections is 50 days before election. This court is required to pass upon objections to papers

filed with the Secretary of the Commonwealth 30 days before the election. The Secretary of the Commonwealth must this year make a certification at least 14 days before the election, which is October 20th. This bill for the injunction was filed on October 8th, asking for a preliminary injunction, which the court heard at the very first available date, October 13th.

Plaintiff avers in paragraph 168 that "by reason of the great mass of nomination papers thus filed, it was absolutely impossible to examine and check the names of all these districts or to determine their real party affiliation until just before the date of the filing of this bill." If, however, plaintiff, in addition to the general allegations of the bill, had confined his specific allegations to the ninth paragraph, which we have heretofore quoted, and which charged that the conspiracy resulted in the nomination of Joseph C. Trainer, the Republican candidate for senator, as a candidate of the "Social Justice Party", every question could have been raised which is raised by the following paragraphs, from 10 to 160 inclusive. It certainly would not have taken much time to have made the investigation sufficient for that, and in this connection we may say that an inspection of the records of this court shows that the preëmptions of the party names involved in this bill were not filed at one time, as the bill avers. One was filed on January 28, 1936, three, including "Social Justice Party", complained of in paragraph 9 heretofore referred to, on May 19, 1936, one on June 22d, and the last on June 26, 1936. Moreover, all of the 53 parties to this bill who are candidates are charged with conspiracy and would have had a right to have been heard. It is quite probable that of the hundred or more preemptors who are charged with having made fraudulent preëmptions, in that they did not intend to organize a political body for the purposes complained of in the 150 paragraphs, might want to testify to deny any ulterior motives. So it would have been practically impossible, even by protracted court sittings, to have heard and de-

cided this case in time for proper certificates to be made by the Secretary of the Commonwealth. It is altogether probable that it could not have been heard and been decided before the election day.

We are of opinion that there was laches in not promptly bringing a bill which could have raised all of the questions raised in this omnibus, and what is dangerously near being multifarious, bill.

We think it is not necessary to discuss the question of impertinent, irrelevant and scandalous matter contained in the bill.

For these reasons we entered the decree October 13, 1936, dismissing the bill at the cost of the plaintiff.