**CITY OF ST. LOUIS, a Municipal Corporation, Appellant,**

**v.**

**James E. CROWE, Herman Willer, Arthur K. Atkinson, and E. Kenneth Hagemann, comprising the Board of Election Commissioners of the City of St. Louis, Defendants-Appellants,**

**Thomas F. Eagleton, Attorney General, Intervenor-Respondent.**

**No. 50032.**

Supreme Court of Missouri,

Division No. 2.

March 9, 1964.

Thomas J. Neenan, City Counselor, David S. Hemenway, Assoc. City Counselor, St. Louis, for plaintiff-appellant.

Samuel H. Liberman, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for defendants-appellants.

Thomas F. Eagleton, Atty. Gen., Joseph Nessenfeld, Asst. Atty. Gen., Jefferson City, for respondent.

PRITCHARD, Commissioner.

In this Declaratory Judgment Action plaintiff, City of St. Louis (hereinafter called "City"), sought to have a judicial construction of Section 121.100(4) (all statutory references are to RSMo 1959, V.A.M.S.) as it relates to the listing of candidates for the offices in primary elections upon the spaces of the voting machines used in that city, as such a construction might bear upon the contemplated action of the members of the Board of Election Commissioners (hereinafter called "Board") in purchasing adapters at an estimated cost of $270,000 to the City for its voting machines to permit votes thereon to be registered for candidates listed in a vertical, single column under the party designation on the ballots for primary elections. It is now and was the position of the Attorney General in an opinion (dated December 20, 1961), which the Board states it will follow, given to the Honorable John M. Dalton, Governor of the State of Missouri, that said statute requires a listing of candidates in a vertical, single column "in the order of filing" and that any other manner is unlawful. There are only fifty vertical spaces which may be utilized on the Shoup voting machine used by the Board, and if more than fifty candidates file, then there will be insufficient vertical levers on the machine to permit the voter to vote for the candidate of his choice. The adapters for the machine will permit such voter selection if candidates are arranged in a single, vertical column in the order of filing.

The trial court dismissed plaintiff's petition upon the grounds that the question is moot; that the parties agree that in the hypothetical event that filing candidates exceed the number of available spaces on the machine it would be legal for the Board to arrange names in two vertical columns and that the only substantial question is whether the Board would have a discretionary right to do so; that it is entirely speculative and hypothetical whether the total number of candidates will exceed the available spaces in a single, vertical column; that there is no controversy between the parties which is appropriate for judicial determination and that any declaratory judgment herein would constitute no more than an advisory opinion which would not

be binding upon future candidates; and for the foregoing reasons, in the exercise of its discretion, the court has determined that no judgment should be entered herein.

The matters of fact alleged in the petition of the City and admitted by the Board and the Intervenor are as follows: The City is a constitutional charter city. The Board is authorized and has the duty to conduct elections in the city, including primary elections. The City is obligated under Section 118.130 to pay costs incurred by the Board in the conduct of elections at which voting machines are authorized by Chapter 121, RSMo 1959. The voting machines were purchased after a successful bond election held therefor in 1955 wherein the voters authorized the City to incur an indebtedness up to $2,275,000 to make the purchase, and the voting machines were used in all elections held in the city after January 1, 1959.

In the primary election the arrangement of the ballot on the machine is as follows: Political parties are placed horizontally at the top above vertical columns; the offices to be filled are in the first vertical column to the voter's left; the candidates' names are in the succeeding vertical columns and are listed in the order of their filing; there are ten vertical columns and fifty horizontal rows for the placement of the names of candidates, offices, propositions and other similar matter; the voter may not vote twice in the same horizontal row; and he turns a lever which records a vote for the candidate of his choice.

For the primary election held August 2, 1960, more than fifty Democratic candidates filed for the various elective offices to be filled. The names of the candidates for the offices of Governor, Lieutenant-Governor and Secretary of State were placed first in the left vertical column for candidates, then the remaining names in the right vertical column, the names in each column being in the order of filing their declarations of candidacy. In the August, 1962, primary election there were less than fifty candidates in the Democratic party who filed their declarations. In the St. Louis County primary elections of 1956 and 1960, where the same Shoup voting machines as were used since 1959 in the city, the listing and arrangement of candidates were the same as was employed by the City in its August 2, 1960 election, except in several more offices some of the candidates were carried to the column next to the right.

Mr. James E. Crowe is the Chairman of the Board of Election Commissioners of the City of St. Louis, having been appointed thereto by the Governor about May of 1961. Mr. Crowe testified that the adapters for the 1,240 voting machines used in the city would cost $220.50 each. After the deadline for withdrawal of candidates (fixed by the Board on June 12 in 1962) it would be administratively impossible to have the adapters installed (for which it would take six weeks) and prepare for the election; it would be uneconomic to put rented adapters on the machines for one election; equipment for paper ballots for elections had been disposed of and would have to be repurchased if used as a substitute for voting machines; and the Board would have a greater fear of the integrity of the ballots being violated by the use of paper ballots, there being, as far as is known, very little trouble, if any, in this respect in the use of the voting machines. In the August, 1962 Democratic primary election more than fifty candidates had filed, but it was not known until June 12 that withdrawals had reduced the number to less than fifty. Because of the various number of candidates running for office in various districts the number on a particular ballot varies from district to district. There are 600 precincts in the City, and in the 1962 primary in a maximum of 33 of these precincts there were more than fifty candidates on the Democratic ticket for all offices. At this point in the trial Mr. Crowe had a consultation with the experts in charge of the voting machines, and he then testified that when the filings were completed in April, 1962,

there were two magistrate districts possibly involving some forty or fifty precincts where the Board had more than fifty candidates. Mr. Crowe was then asked the question: "Well, then, what reason would there be to acquire adapters for more than those forty or fifty precincts?" An objection was made and sustained to this question upon the ground that the question at issue here is whether the Board is required to follow the opinion of the Attorney General. Mr. Crowe then testified that the Board could have, in the exercise of its discretion, irrespective of what the Attorney General ruled, purchased the adapters, but it felt that they were unnecessary and particularly at the price. It is the feeling of the Board that it would follow the opinion of the Attorney General as the chief legal officer of the state, but it would not purchase the adapters except as based upon that opinion, or unless the court upholds that theory of the law.

In the event that five candidates for the office of Governor were certified to the Board by the Secretary of State, Mr. Crowe testified that one method to comply with the statute would be to list the first candidate on the top of the left-hand side and the second candidate in the adjoining column to the right, the third candidate under the first candidate in the left-hand column, the fourth over in the second column and the fifth back in the left-hand column. Another method would be to list the first three in the left-hand column and the next two over in the other column, which would be a matter of administrative discretion, the way it has been exercised up to this time. If there are more than fifty candidates there is no other way to list them; the second column must then be utilized because the voting machine has certain technical limitations by which the Board is bound, and it lists the candidates as best it can. If the total number of candidates exceeded the available space on all columns not required for the opposite party's candidates, a new machine would have to be purchased. The adapters were not invented at the time the Shoup voting machine came into existence.

The matter of the purchase of the adapters was discussed with the Board of Estimate and Apportionment of the City, and as a financial matter that Board did not want to spend $270,000 for adapters, particularly when the Board of Election Commissioners doubted the necessity for the purchase. The Board of Election Commissioners would not proceed with that kind of an expenditure without having some prior approval from the City, or at least some way of being able to pay the company for the equipment.

The first question is whether a justiciable controversy exists among these parties. We have the situation of the City and the Board agreeing that such controversy does exist, and the Attorney General, as Intervenor, contending that it does not exist.

■ The real question here is not concerned with a past (moot) election, or a future election involving a hypothetical event (more candidates filing in the future than there are available spaces on the voting machines) which may or may not happen (except insofar as those events would be evidence of the need for the adapters). Nor is a mere advisory opinion sought. These foregoing considerations, existing alone, have been held to bar the exercise of jurisdiction in Declaratory Judgment Actions. See discussion of the Declaratory Judgment Act (now Chapter 527, RSMo 1959) in the case of City of Joplin v. Jasper County, 349 Mo. 441, 161 S.W.2d 411. See also State ex rel. Chilcutt v. Thatch, 359 Mo. 122, 221 S.W.2d 172; Tietjens v. City of St. Louis, 359 Mo. 439, 222 S.W.2d 70; Preisler v. Doherty, 364 Mo. 596, 265 S.W.2d 404; Jacobs v. Leggett, Mo., 295 S.W.2d 825; and M.F.A. Mutual Insurance Company v. Hill, Mo., 320 S.W.2d 559. It is apparent that the question between the City and the Board is whether the Attorney General's opinion is correct and that the Board is required to follow it

and as a result of that requirement the Board is going to prepare its voting machines by the purchase and use of adapters to accommodate all candidates in providing spaces for their names if their number exceeds fifty, the present available spaces on the machines. The Board states in its answer and in its brief (and the only evidence is) that it is required to and *will* follow the Attorney General's opinion (in the absence of a judicial determination of the issue) and list the names of candidates in vertical order under the names of political parties on the voting machine ballots. The Board further states that it *will* expend public funds of the City in the estimated amount of $270,000 for the voting machine adapters to be purchased by the Board, negotiations for which are pending. The City maintains that the Attorney General's opinion is not correct and that the Board's contemplated purchase of the adapters based solely upon that opinion will subject the City to an unnecessary disbursement of public funds. While agreeing in some respects, the City and the Board are adversary parties in that the Board is threatening to purchase the adapters and the City is objecting thereto. The rights of the City in its function of protecting the disbursement of funds is imminently threatened by the contemplated action of the Board. See Tietjens v. City of St. Louis, supra, loc. cit. 222 S.W.2d 71 [1–4], where it was said: "A declaratory judgment presupposes a present controversy between actual parties as to their respective rights and obligations arising from an actual transaction or *an intended* transaction presently prohibited by law or contract." (Emphasis added.) See also Borchard, Declaratory Judgments, pp. 930, 984. We hold that there is here a present, justiciable controversy, ripe for determination, and in which there may be a judgment entered which will settle the rights and obligations of these parties (in expending the City's funds by purchase of the adapters) as they are involved by a construction of Section 121.100 (4) relating to listing and arrangement of candidates upon the primary election ballots of voting machines.

"The doctrine is settled that relief by declaratory judgment was not intended to displace all existing remedies; that under the foregoing and similar statutes the courts have a wide discretion in administering it; but that the discretion so exercised must be a sound judicial discretion based on good reason, and calculated to serve the purposes for which the legislation was enacted, namely, to afford relief from uncertainty and insecurity." State ex rel. United States Fire Ins. Co. v. Terte, 351 Mo. 1089, 176 S.W.2d 25, 28 [2]. Under the facts of this case, where a justiciable controversy exists, the trial court could not use its discretion as a ground for dismissal. See also City of Creve Coeur v. Creve Coeur Fire Prot. Dist., Mo., 355 S.W.2d 857, 860 [8]. The trial court erred in dismissing the petition upon the stated grounds.

■ Inasmuch as all of the pleadings state the issue, and the evidence has been adduced, in the interest of avoiding the prolongation of this litigation we will proceed to decide this case without remanding it for further hearing. Supreme Court Rule 83.13(c), V.A.M.R.; Magenheim v. Board of Education, Mo.App., 347 S.W.2d 409, 418 [13]. We thus reach the basic issue of the construction of Section 121.100(4) as it applies to the Board in "listing the names of candidates in the order of filing" upon the ballots of the primary elections within the City of St. Louis.

Section 121.100(4) reads as follows:

"The order of the arrangement of parties and candidates shall be as provided by law not in conflict herewith *except that the candidates for nomination for any one office at any primary election shall be listed in the order of filing,* * * *." (Our emphasis.)

■ This section of the statutes now under scrutiny is clear and unambiguous in

its language. It is not susceptible of more than one construction. Therefore, we may not resort to any extraneous matter because there is no room for construction of such language. State ex rel. Bell v. Phillips Petroleum Co., 349 Mo. 360, 160 S.W.2d 764; Rathjen v. Reorganized School Dist. R–II of Shelby County, 365 Mo. 518, 284 S.W.2d 516. We have no right to read into the statute an intent which is contrary to the legislative intent made evident by the phraseology employed. State ex inf. Rice ex rel. Allman v. Hawk, 360 Mo. 490, 228 S.W.2d 785; Steggall v. Morris, 363 Mo. 1224, 258 S.W.2d 577. The legislative pronouncement means what it says: That on the voting machine ballots the candidates for any nomination for any one office at any primary election shall be listed in the order of filing. In our opinion this can mean only one thing which is that the person first filing for nomination is entitled to have his name on the ballot in first place, the second filer below the first, and so on in a *single, vertical* column. We cannot give to the legislative phraseology "listed in order of filing" the singled-out dictionary definitions ingeniously proposed by the City herein to permit double column listing of candidates on the ballot. (e. g., Webster's International Dictionary, Unabridged, Second Edition, defines the word "list": "3. To enclose as with a rail or barriers; to bound. 'Obs." "4. To enter or enroll in a list or catalogue; * * *"; and defines the words "in order" as: "In suitable arrangement or sequence; * * *.") Such definitions would be attributing to these legislative words a strained, unnatural meaning in connection with their application to listing of candidates' names on the ballot. We reject the arguments of the City that the plain meaning of these words is that the candidates' names shall be entered or enrolled in a suitable arrangement or sequence in relation to the time the candidates filed.

The Board claims that it has some limited discretion in arranging names of candidates on the ballot if the total number exceeds fifty which is the number of available vertical spaces on the machine. Yet both the Board and the City agree with the Attorney General that the statute is mandatory. Such is the general rule. See 29 C.J.S. Elections § 158, p. 230; Nugent ex rel. Manning v. La France, 91 R.I. 398, 164 A.2d 230; Davidowitz v. Philadelphia County, 324 Pa. 17, 187 A. 585; Putnam v. Kozer, 119 Or. 535, 250 P. 625. We are unable to see how there could be an exercise of discretion in the face of a mandatory statute. Mandatory means "Containing, of the nature of, or pertaining to, a mandate or command; hence, obligatory"; Discretion means "Power of free decision; individual judgment; undirected choice." Webster's International Dictionary, Unabridged, Second Edition. The legislature, by the plain words used, must have intended that there should be no discretion, else what would there be to prevent any arbitrary selection of the names of candidates for any office (at the top, bottom, middle or any location on the ballot) and set them over in a second column? If such selection occurred the rights of candidates to have their names listed in vertical order of filing within the plain terms of Section 121.100(4) would be infringed.

If the terms of the statute are followed and the names of candidates for nominations to various offices are listed in a single, vertical column opposite the name of the office, which must be done, it is clear that no confusion can result in the mind of the voter in ascertaining what candidates are running for a particular office. The voter may with ease make his selection. He is not compelled to look elsewhere on the ballot for any other person for whom he may vote; there is no possibility that he will overlook the names of candidates arranged in such single, vertical column. We need not speculate upon the confusion to the voter that may be inherent in the use of double column listing of candidates for various offices on these voting machines, but it is obvious that it would be somewhat greater than by the use of single column listing.

We hold that Section 121.100(4) is clear and unambiguous in its wording and is not subject to a judicial construction; that it is mandatory; that there is no discretion whatsoever vested in the Board in the matter of arrangements of candidates in primary elections, but that the words of the statute, "except that the candidates for nomination for any one office at any primary election shall be listed in the order of filing" mean simply that such candidates shall be by the Board listed only in a single, vertical column from top to bottom in successive order of filing, opposite the name of the office to be filled and under the label of the political party in which the candidates seek nomination. Such holding carries out the legislative purpose contained in Chapter 121, and does not render the use of voting machines impossible.

The principal issue is whether the Board may expend city funds for the voting machine adapters. For all 1,240 of the Board's voting machines, such adapters would cost a total of approximately $270,000. We are deciding this case de novo in a declaratory judgment action. We thus consider the reasonableness of the Board's contemplated purchase of the adapters. We note that the evidence is that in only two magistrate districts, involving forty or fifty precincts (out of the total of 600 precincts) within the city there were more than fifty candidates for nomination in the August, 1960, primary election. It would follow that in precincts such as these, if the filings in future primary elections exceeded the available fifty spaces on the voting machines, the adapters would have to be installed to permit their use. Thus, the Board has a discretion to install adapters on voting machines to be used in those precincts. Nevertheless, we hold that it would be unreasonable and an abuse of the Board's discretion to install adapters upon all 1,240 machines, when such adapters were needed upon only a small fraction of that number. In its purchase the Board may procure only so many of the voting machine adapters as the evidence available to it, prior to election and after the filing of candidates is completed for such election, reasonably indicates is needed.

The judgment is reversed and this case is remanded to the trial court with directions to enter a judgment declaring that (1) Section 121.100(4), RSMo 1959, V.A.M.S., is clear and unambiguous and is not therefore subject to judicial construction; (2) that the provisions thereof are mandatory and are binding upon the Board of Election Commissioners of the City of St. Louis; (3) that said Board has no discretion whatsoever in the matter of arrangement of candidates in primary elections, but that the mandatory words of the statute "except that the candidates for nomination for any one office at any primary election shall be listed in the order of filing" mean that such candidates shall be listed by said Board only in a single, vertical column from top to bottom in successive order as to time of filing their declarations of candidacy, and opposite the name of the office for which nominations are sought and under the label of the political party in which such candidates seek nomination; (4) in order to utilize its voting machines in all voting precincts of the City of St. Louis, the Board may purchase such number of voting machine adapters as the evidence available to it reasonably indicates will be needed by reason of more candidates filing than there are available spaces on the voting machines in any precinct or precincts in any future primary election.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.